# UNITED STATES DISTRICT COURT FOR
# THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE HARRISBURG AUTHORITY, | : | |
| | : | |
| and | : | |
| | : | |
| COUNTY OF DAUPHIN, | : | No. 4:08-cv-00180-JEJ |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| CIT CAPITAL USA, INC. | : | |
| | : | |
| and | : | |
| | : | |
| AIREAL TECHNOLOGIES OF | : | |
| HARRISBURG, LLC, | : | |
| Defendants. | : | GOLDBERG KATZMAN, P.C. |

Ronald M. Katzman, Esquire (I.D. # 07198)
Royce L. Morris, Esquire (I.D. # 64310)
Steven E. Grubb, Esquire (I.D. # 75897)
David M. Steckel, Esquire (I.D. # 82340)
Attorneys for The Harrisburg Authority
320 Market Street, P. O. Box 1268
Harrisburg, PA 17108-1268
(717) 234-4161

METTE, EVANS & WOODSIDE
Charles B. Zwally, Esquire (I.D. # 07137)
Daniel L. Sullivan, Esquire (I.D. # 34548)
Attorneys for Dauphin County
3401 North Front Street
Harrisburg, PA 17110
(717)232-5000

| | | |
|---|---|---|
| THE HARRISBURG AUTHORITY | : | THE COURT OF COMMON PLEAS OF |
| One Keystone Plaza, Suite 104, Front & | : | DAUPHIN COUNTY, PENNSYLVANIA |
| Market Streets, Harrisburg, PA 17101 | : | |
| | : | CIVIL DIVISION |
| and | : | |
| | : | NO.: |
| COUNTY OF DAUPHIN | : | |

| | | |
|---|---|---|
| ~~Second and Market Streets~~ | : | ~~Action for Declaratory Judgment~~ |
| ~~Harrisburg, PA  17101~~ | : | ~~(Pa. R.C.P. 1601)~~ |
| ~~Plaintiffs~~ | : | |
| ~~v.~~ | : | |
| | : | |
| ~~CIT CAPITAL USA, INC.~~ | : | |
| ~~505 Fifth Avenue~~ | : | |
| ~~New York, NY  10017~~ | : | |
| | : | |
| ~~and~~ | : | |
| | : | |
| ~~AIREAL TECHNOLOGIES OF~~ | : | |
| ~~HARRISBURG, LLC~~ | : | |
| ~~c/o CT Corporation System~~ | : | |
| ~~1515 Market Street, Suite 1210~~ | : | |
| ~~Philadelphia, PA  19102~~ | : | |
| ~~Defendants~~ | : | |

## AMENDED COMPLAINT

Plaintiff, The Harrisburg Authority (THA), by and through its counsel, Goldberg

Katzman, P.C. and Plaintiff, County of Dauphin (County) by and through its counsel, Mette,

Evans & Woodside, bring this Complaint against Defendants CIT Capital USA, Inc. (hereinafter

"CIT") and Aireal Technologies of Harrisburg, LLC (hereinafter "Aireal"), and state as follows:

## PARTIES

1.     Plaintiff The Harrisburg Authority ("THA") is a body corporate and politic of the

Commonwealth of Pennsylvania with principal offices at One Keystone Plaza, Suite 104, Front

and Market Streets, Harrisburg, Pennsylvania 17101.  THA is the owner of the Harrisburg

Materials, Energy, Recycling and Recovery Facility located at 1690 South Cameron Street,

Harrisburg, Pennsylvania 17104 (the "Facility").

2.     THA is a municipal authority established under the Municipal Authorities Act, 53

Pa. C.S.A. §5601, et seq. ("MAA") and agency of the Commonwealth of Pennsylvania.

3.      The County of Dauphin is a third class county of the Commonwealth of Pennsylvania with principal offices at Second and Market Streets, Harrisburg, PA  17101 (the "County").  THA and the County are sometimes collectively referred to herein as the "Plaintiffs."

4.      Defendant CIT is a corporation organized and existing under the laws of the State of Delaware with a principal place of business located at 505 Fifth Avenue, New York, New York 10017.

5.      Defendant CIT does business in the State of Pennsylvania, but is not registered to do so and does not have a Certificate of Authority pursuant to the requirements of the Foreign Business Corporation Law, 15 Pa. C.S.A. §4121(a).

6.      Defendant Aireal is a limited liability company organized and existing under the laws of the State of Delaware and has an office located at:  The CT Corporation System, 1515 Market Street, Suite 1210, Philadelphia, PA  19102.

7.      Aireal is registered to do business in Pennsylvania, and has, within the relevant time period involved in this case, done business with THA in Dauphin County, Pennsylvania, in connection with the transactions at issue in this Complaint.  CIT is now the purported owner of 100% of the membership interests in Aireal, which is the alter ego of CIT.

8.      CIT, while not registered to do business in Pennsylvania, has, within the relevant time period involved in this case, conducted business in Pennsylvania, and has done business with THA in Dauphin County, Pennsylvania, in connection with the transactions at issue in this Complaint.

3

9.     THA's and the County's causes of action against Defendants arose in Dauphin

County and the events giving rise to their respective claims occurred in Dauphin County.

## BACKGROUND ON THE HARRISBURG INCINERATOR PROJECT

10.     The claims at issue in this complaint relate to a retrofit/modernization project

costing an amount of approximately $125,000,000 to develop, design, construct and install

equipment and materials necessary to upgrade and retrofit the Facility owned by THA, an

outdated trash incinerator, so that it could effectively process waste into steam and electrical

energy, using state-of-the-art combustion technology (the "Project").

11.     In order to finance the Project, THA issued various series of bonds, consisting of

its Guaranteed Resource Recovery Facility Revenue Bonds, Series D of 2003 (the "2003D

Bonds"), Guaranteed Federally Taxable Resource Recovery Facility Revenue Bonds, Series E of

2003 (the "2003E Bonds"), and Guaranteed Federally Taxable Resource Recovery Facility

Revenue Bonds, Series F of 2003 (the "2003F Bonds") (the 2003D, 2003E and  2003F Bonds,

collectively, the "Retrofit Bonds") pursuant to a Trust Indenture dated as of December 1, 2003

(the "Retrofit Indenture") between THA and Commerce Bank/Pennsylvania, National

Association, as trustee (the "Retrofit Trustee").

12.     The County, in recognition of the County-wide benefits of the Project and in light

of the County's responsibilities for municipal waste planning under The Municipal Waste

Planning, Recycling and Waste Reduction Act, 53 P.S. § 4000.101 et seq., provided a guaranty,

secondary to the guaranty of the City of Harrisburg (the "City") of the 2003D Bonds and the

2003E Bonds collectively in the maximum aggregate principal amount not to exceed

$110,980,000 by entering into a County Bond Guaranty Agreement with THA and the Retrofit

Trustee and further guaranteed THA's payments under a Qualified Interest Rate Management

Agreement with respect to the 2003D Bonds (collectively the "County Guarantees").  True and

correct copies of the County Bond Guaranty Agreement and the County Swap Guaranty are

attached hereto as Exhibits A and B respectively.

13.     To induce the County to execute and deliver the County Guarantees, THA, the

City and the County entered into a Reimbursement Agreement dated as of December 1, 2003

(the "Reimbursement Agreement") providing for, <u>inter alia</u>, the parties' respective rights and

obligations including repayments to the County for amounts paid by the County under the

County Guarantees in addition to other covenants as specified in the Reimbursement Agreement.

A true and correct copy of the Reimbursement Agreement is attached hereto as Exhibit C.

14.     The retrofitted Facility, as designed by Barlow Projects, Inc. and companies

related to it and under its control (hereinafter "Barlow"), was to have three new furnace-boiler

combustion units, each capable of burning <u>a total of</u> 728 tons of municipal solid waste per day; a

new 24 megawatt steam turbine generator; new air pollution control systems consisting of acid

gas scrubbers, baghouses for particulate control and activated carbon injection to control

mercury and dioxins; and other associated plant equipment.  Some of this technology was under

patent and defined as "Combustion Technology" in the relevant agreements.  <u>See</u> Exhibit D,

Section 1 for definition.  Hereinafter, whenever the term "Combustion Technology" is used as a

defined term, it shall refer to this definition.

15.     Late in 2003, in reliance on Barlow's preliminary retrofit design, THA issued the

Retrofit Bonds to obtain the necessary funding for the retrofit Project.

16.     After THA obtained the necessary funding, THA and Barlow entered into agreements pursuant to which Barlow agreed to perform the construction and supply the proprietary equipment, and also to perform design and engineering services and construction management for the remainder of the construction project.

17.     Because of negligence and breaches of contract on the part of Barlow, which included design flaws, engineering failures, specification of unsuitable equipment components, neglectful project management, delays in construction, unfinished construction work, errors in the start-up testing phase, and lack of financial resources to meet various performance obligations under the agreement discussed below, the retrofit of the Facility has never been completed, nor has the retrofitted Facility ever operated properly, despite the fact that THA paid the full amount required of it under its contract with Barlow.

18.     The agreement with Barlow was memorialized initially in three separate contracts, detailed below.

I.      Agreement for Sale and Installation of Equipment

a.      On May 6, 2004, THA and Barlow entered into an Agreement for Sale and Installation of Equipment, dated as of December 31, 2003, in the amount of $45,777,957 (the "Equipment Contract"), in which Barlow agreed to provide and install the proprietary and other necessary and specialized equipment and provide the professional engineering services necessary to complete the retrofit of the existing Facility.

b.      Subsequent Change Orders and Amendments to the Equipment Contract were entered into between THA and Barlow, which increased the Equipment Contract amount to $52,575,029.68.

c.      To date, Plaintiff has paid Barlow $51,575,029.68 of that total Contract price under the Equipment Contract, which Barlow failed to perform properly and also failed to complete.

d.      Plaintiff ~~must now~~has been compelled to enter into an additional contract for an amount in excess of $25 million in order to complete and correct the work which Barlow failed to perform.

II.      The Professional Services Agreement

a.      On May 6, 2004, THA and Barlow also entered into an Amended and Restated Professional Services Agreement (the "Services Contract"), dated as of December 31, 2003, in the amount of $12,767,599, in which Barlow ~~Projects~~ promised to perform engineering, procurement and construction management services in connection with the final design, procurement, construction, start-up and testing phases of the project.

b.      The parties entered into two amendments to the Services Contract.

c.      Barlow ~~Projects~~ represented in the Services Contract that, among other things, it had the necessary financing, engineering, expertise and employees/agents to perform the work under the Services Contract.

III.      The Nonexclusive Technology Sublicensing Agreement

a.      This Agreement was entered into as of December 31, 2003 between a Barlow entity, Barlow Projects Harrisburg, LLC, and THA (the "Original Sublicensing Agreement").  A true and correct copy of the Original Sublicensing Agreement is attached hereto and marked Exhibit D.

b.        Pursuant to the Original Sublicensing Agreement, Barlow agreed to provide a nonexclusive license to use the Combustion Technology which was to be installed by Barlow pursuant to the Equipment Contract and which was a proprietary system for which THA purchased a nonexclusive license to use the Combustion Technology.

c.        While the Agreement speaks for itself, commencement of payments for the sublicense was not required, pursuant to paragraph 6 of the Agreement, until "Substantial Completion" as described therein had occurred, which never did occur.

d.        Additionally, pursuant to paragraph 7(a) of the Original Sublicensing Agreement, THA was to pay $.50 per ton for each ton of waste processed through each "Combustion Unit" that had achieved "Final Completion." The sublicense fee would expire the 20th year after each "Combustion Unit" had achieved "Final Completion," although the sublicense itself was to continue in effect as long as the Combustion Technology was used at the Facility.

## OPERATIVE FACTS

19.      The Original Sublicensing Agreement (Exhibit D) was amended by Amendment No. 1 in July of 2005, a copy of said Amendment being attached hereto as Exhibit E (herein "Amendment No. 1"). Said document was executed by both parties. This document was also titled as Amendment No. 4 to the Equipment Contract, but is referred to herein as Amendment No. 1.

20.      Pursuant to Amendment No. 1, THA paid an amount of approximately $2.7 million in full satisfaction of the sublicense fees, as calculated in the Original Sublicensing Agreement (Exhibit D hereof) at paragraph 7(a).

IV.      The Retrofit Project

21.     The retrofit and upgrade of the Harrisburg Facility was to take approximately 24 months, with the Facility restarting in ~~2006~~late 2005.

22.     In the late fall of 2005, Barlow, which was substantially behind schedule and out of money, sought an extension of the completion date and additional funding for the Project.

23.     Thereafter, Barlow began efforts to raise additional funding that was necessary to finish the Project, since Barlow had already received substantially the entire contract price as per its contract with THA.

24.     Barlow eventually obtained additional capital in the amount of $25 million, through a loan from CIT.

V.      Loan Arrangements with CIT

25.     A series of agreements involving THA was created by attorneys for CIT and THA during December of 2005 and January of 2006, culminating in execution on January 10, 2006, and January 11, 2006 ~~and January 12, 2006~~.

26.     These agreements included:

       a.      Amendment No. 9 to the Amended and Restated Agreement for the Sale
               and Installation of Equipment, attached hereto as Exhibit F (herein
               "Amendment No. 9");

       b.      First Amended and Restated Non-Exclusive Technology Sublicensing
               Agreement ("SLA of December 21"), between Barlow Projects
               Harrisburg, LLC (the Barlow entity which was obligated to complete
               construction of the Facility) and THA, as approved by THA's Board.  A
               copy of said document is attached hereto as Exhibit G.

~~b.~~c.     First Amended and Restated Non-Exclusive Technology Sublicensing

Agreement and Technology Purchase Agreement, dated "as of" January

11, 2006, between Barlow Projects Harrisburg, LLC (the Barlow entity

which was obligated to complete construction of the Facility) and THA

(the "Restated Sublicensing Agreement").  A copy of said document is

attached hereto as Exhibit G-1.

~~e.~~d.     Consent of THA to Assignment and Assumption Agreement between

Barlow and Aireal, and Consent of THA to purchase by CIT of Barlow's

membership interest in Aireal, attached hereto as Exhibit H.

27.     The documents attached hereto as Exhibit G-1 and Exhibit H were never

approved by THA, at a duly-constituted Board meeting, and the signatures thereto were not

effective to create a legal obligation on the part of THA.

28.     The only official, public meeting at which any action at all was taken with respect

to any of the documents between THA and Defendants, and any agreements with Barlow that

were assigned to Defendants, occurred on December 21, 2005.

29.     At that meeting, besides approving several amendments to the Equipment

Agreement, THA approved the SLA of December 21, Exhibit G hereof, as well as a document

entitled "Form of Consent and Agreement."

30.     As contained in the official records of THA, the form of the SLA of December 21

that was approved was an incomplete document consisting only of odd-numbered pages and

bearing an indication that this had been version 3 of a document.

31.     The document, SLA of December 21, Exhibit G hereof, was approved by Resolution No. 2005-0019 of THA of December 21, 2005, and placed among the official records of THA.  A copy of said Resolution is attached hereto as Exhibit G-2.

32.     There never has been legal authorization for individual members of THA to execute any other version or draft of Exhibit G, or to undertake any other obligations with respect to said document, various subsequent drafts of said document, and other documents dated on or about January 11, 2006.

33.     Resolution No. 2005-0019 of December 21, 2005, attached hereto as Exhibit G-2, was not legally effective to authorize approval and execution of Exhibit G-1, which was a substantially changed version of Exhibit G that underwent approximately ten drafts between December 21, 2005 and January 11, 2006.

34.     To the extent the aforesaid Resolution of December 21, 2005 (Exhibit G-2) purported in Item 4 to vest approval of further amendments and restatements in the Authority Chairman, Executive Director and Solicitor, said delegation was contrary to the law of Pennsylvania, which Defendants knew, or should have known.

35.     On or about December 28, 2005, the nature of the proposed agreements between the parties radically changed, and extensive changes were made in the document, Exhibit G, that had been approved by the Authority, and, in addition, several entirely new agreements were drafted involving THA, which were extremely detrimental to THA.

36.     The document entitled "Consent to Assignment," as incorporated in Resolution No. 2005-0019, was never pursued by the parties and became moot.

37.   None of the changes, and subsequently-drafted documents, attached hereto as Exhibits G-1, H and I, were ever approved by THA, nor were they approved by the Authority Chairman, Executive Director and Solicitor.

27.38.  All of these agreements, plus others to which THA was not a signatory, were done to veil the reality that the role to be imposed upon THA by CIT was to provide a guaranty to CIT of repayment of the funds CIT loaned to Barlow.

28.39.  The Restated Sublicensing Agreement (Exhibit G-1) purported to replace the Original Sublicensing Agreement dated as of December 31, 2003, attached hereto as Exhibit D, and purported to establish a new, substantially increased sublicense fee, along with onerous provisions and conditions that were contrary to the law and detrimental to THA.

29.40.  This "arrangement"The documents referred to in paragraph 37 above failed to recognize that, in accordance with the fifth "Whereas" on page one of Amendment No. 1 to the Original Sublicensing Agreement (Exhibit E), and Exhibit D hereof, THA had already acquired the right to use the Combustion Technology and had, six months prior to the execution of the Restated Sublicensing Agreement (Exhibit G)January 11, 2006, had paid in full and in advance all of the sublicensing fee payments required of it under the Original Sublicensing Agreement (Exhibit D).

30.41.  The aggregate of the annual license fee payments under the Original Sublicensing Agreement amounted to approximately $2.7 million, which, having been paid in full prior to January, 2006, as per Exhibit E, completely discharged all obligations of THA to pay for its right to use the Combustion Technology.

31.42.  As set forth in the fifth Whereas clause of Amendment No. 1 (Exhibit E), the parties agreed six months before entering into the Restated Sublicensing Agreement (Exhibit G-1) to amend the Original Sublicensing Agreement to "eliminate $2.7 million dollars in sublicensing payments required of it under the Licensing Agreement," which monies THA paid, in advance, in cash and in a lump sum, in accordance with paragraphs 3 and 7 of Amendment No. 1 (Exhibit E).

43.     Defendants knew, or should have known, that full payment with respect to the right to use the Combustion Technology had already been made by THA.

44.     The Restated Sublicensing Agreement (Exhibit G-1) purports to value the right to use the Combustion Technology in an amount up to $25 million, whereas the Original Sublicensing Agreement (Exhibit D) for obtaining sublicensing rights, valued the technology at $2.7 million to be paid ratably over a period of 20 years after the construction was complete.

45.     Payments were to commence under Exhibit D only after Barlow completed the construction was complete. and the Combustion Technology was able to be used by THA, something which never occurred.

46.     The amount of $25 million bears no relationship to the value of the Sublicense and was a contrived figure based only upon the amount of the loan which CIT had agreed to make to Barlow based on estimates made as to the money needed to complete its work.

33.47.  The value of the sublicensing fee under the Original Sublicensing Agreement, discounted at 6% to present worth, is approximately $1,570,000.00.

34.48. Thus, in July of 2005, THA had already ~~paid~~ provided Barlow consideration in excess of $1 million more than it was originally contractually obligated to pay for the sublicensing fee.

35.49. The amount set forth in paragraphs ~~32~~ 44, ~~and 33~~ 45 and 46 above is determined from the fact that the practical capacity of the Facility after all construction was properly concluded was to process 728 tons of solid waste per day, in accordance with the averments of paragraph 14, supra, for which it was to pay license fees in the amount of $.50 per ton for 20 years, pursuant to paragraph 7 of the Original Sublicensing Agreement (Exhibit D).

~~36. Said payments were not to begin until final completion by Barlow, which never occurred.~~

37.50. Even if properly approved, ~~T~~there was nevertheless a total lack of consideration for the Restated Sublicensing Agreement (Exhibit G-1) which purports to require THA to pay for the same thing twice, and at more than 10 times the price which was originally contracted as the sublicense payment for the right to use the Combustion Technology.

38.51. Even if properly approved, ~~T~~there ~~is~~ was nevertheless a total lack of consideration for the Restated Sublicensing Agreement (Exhibit G-1) which purports to require THA to pay sublicensing fees a second time in an amount far in excess of its original contract, despite the fact that it would not be able to make any use or obtain any value from the Combustion Technology.

39.52. In any event, ~~T~~the Restated Sublicensing Agreement (Exhibit G-1) would constitutes an *ultra vires* act whereby THA agreed to pay for something: a) which it already had paid for in full, and b) which it could not use. in contravention of its powers and authority pursuant to the MAA.

40.53.  Moreover, THA received no consideration for having entering entered into the Restated Sublicensing Agreement (Exhibit G-1).

54.     There was no legal authorization for individual members of THA to execute any other of the documents between THA and Defendants on or about January 11, 2006.

55.     The "approval" by THA at its meeting of December 21, 2005 was a nullity, and none of the other agreements executed with Defendants in January 2006 were ever validly and lawfully entered into by THA.

41.56.  Pursuant to paragraph 3 of Amendment No. 9 (Exhibit F), the term, Barlow Related Entities, was defined by reference to the fourth Whereas clause in Amendment No. 5 as "all associated entities now in existence or to be created."

42.57.  Amendment No. 9, attached hereto as Exhibit F, provided in paragraph 5 that "all Associated Barlow Entities" would assume any payment obligations of THA.

43.58.  Pursuant to that definition, Aireal became, at its creation on January 5, 2006, responsible for payment to THA of whatever monies were to be "forwarded" by THA to CIT pursuant to paragraph 5 of said Amendment No. 9 (Exhibit F).

59.     Even if the agreements between THA and Defendants were validly and lawfully entered into by THA, the Restated Sublicensing Agreement and the Assignment Agreement (Exhibits G-1, H and I), in light of Amendment No. 9 of the Equipment Agreement, resulted in Defendant Aireal being responsible to pay THA any monies that THA was obligated to "forward" to CIT.

60.     Since Aireal failed to provide any such monies to THA, THA had no obligation to make any payments pursuant to Exhibit G.

44.61.  Moreover, the only obligation of THA pursuant to Amendment No. 9 (Exhibit F) was to "forward" monies received by it from "Barlow entities" (as defined in Amendment No. 9 Exhibit F) to the licensor, which ~~therefore~~ thereby became an obligation of Aireal, which was not erased by the assignment of the same date from Barlow Projects Harrisburg, LLC (Exhibit H).

45.62.  When Barlow, which owned 100% of the membership interests in Aireal, transferred its ownership interest to CIT (Exhibit H), Aireal was already an "~~Associated~~ associated Barlow ~~Entity~~entity" with the responsibility of making said payments, and thus remained obligated to make the payments which THA was to "forward" to CIT.

~~46.At the time of the transfer, Aireal was a "Barlow Entity," as defined in Amendment No. 9 (Exhibit F) and thus remained obligated to make the payments which THA was to "forward" to CIT.~~

47.63.  While there is nothing to identify which of several agreements dated January 11, 2006 were executed first, it is clear from its reference to the Restated Sublicensing Agreement (Exhibit G) that Amendment No. 9 (Exhibit F) was executed subsequently.

VI.     The Agreements are not valid

48.64.  All of the agreements were intended to conceal the fact that THA was actually to become a guarantor of the loan taken out by its contractor, Barlow.  ~~Hereinafter, the Restated Sublicensing Agreement (Exhibit G), the Consents of THA (Exhibits H and I) are sometimes collectively referred to as the "Barlow, Aireal, CIT Documents").~~

49.65.  The majority of the monies loaned by CIT to Barlow were ~~used~~ applied directly by CIT to pay Barlow subcontractors for work done in the past, and the remainder was applied to fees to CIT and its attorneys, as well as to pay for work which Barlow continued to perform on

the Project.  All payments to subcontractors, past and future, as well as the payments to CIT and

its attorneys, were obligations of Barlow, and were not obligations of THA.

50.66.  None of the borrowed funds disbursed by CIT were ever paid to or received by

THA, and THA received no benefit from payment of any of said funds.

51.67.  Indeed, in its simplest form, devoid of the subterfuge and the ruse created by

Barlow, its related entities. and CIT, CIT provided approximately $25 million to Barlow, and

which Barlow, or its related entities, were required to pay it back to CIT. The arrangement that

was made gave THA nothing more than what it already had – the clear right to use the

Combustion Technology when the construction work of Barlow was completed, which right it

already had acquired as of December 31, 2003, as part of the Equipment Agreement and Exhibit

D hereof pursuant to a structure that gave THA nothing more than what it already had—a clear

right to the Combustion Technology which THA had as early as July of 2005.

52.68.  Equally indicative of this sham transaction is that if CIT truly "owned" Aireal

(and its lone asset of the Combustion Technology) and "paid" Barlow approximately $25 million

for it, if THA is expected to repay CIT the $25 million purchase price, then CIT, in reality, has

paid nothing for the technology.

53.69.  The entirety of the Barlow, Aireal, CIT Documents is nothing more than lawyers,

and the entities they represent, creatively attempting to create somethingcause THA to engage in

*ultra vires* acts which the law prohibits and this rusewhich must be exposed and voided by the

Court.

54.70.  THA has no authority, under its charter or under the MAA, to guarantee debts of others, and particularly those of a private party, its contractor, from whom it is owed more than $40 million in damages, and any such undertaking was *ultra vires*.

71.    Defendants knew, or should have known, that any agreement by THA to the documents executed on or about January 11, 2006 constituted an *ultra vires* act and were therefore null and void.

55.72.  Any agreements imposing an obligation on THA to pay any monies to CIT or Aireal constitute an *ultra vires* acts and are null and void.

56.73.  Moreover, there is a lack of consideration flowing to THA with respect to the Barlow, Aireal, CIT Documents executed in January of 2006, since THA receives nothing more than what it was already entitled to:  (i) Barlow doing what it already had contracted to do and for which it had been substantially paid in full and (ii) the right to limited use of the Combustion Technology, which THA had already acquired and paid for in full.  Said agreements, to the extent they adversely affect THA, are *ultra vires* and otherwise null and void.

VII.    The Illegal Backdating

74.    After attaching signatures in blank by the Chairman and Secretary of THA to Exhibit G and related documents on January 11, 2006, the attorneys for the parties made a change in Exhibit G by inserting at the end of paragraph 15, words designed to remove Defendant Aireal as a "Barlow entity."

75.    The words which were added are as follows:  "The parties hereto acknowledge and agree that to the extent this Sub-License is assigned pursuant to a Permitted Assignment, the applicable Permitted Assignee and any third party purchaser of the equity interests of such

Permitted Assignee shall not be considered an Associated Barlow Entity for purposes of the Equipment Agreement."

76.     By inserting said language, Defendants were attempting to relieve themselves of the obligation to provide the funds to THA with which it could fulfill any obligations pursuant to Exhibit F hereto to "forward" monies to CIT pursuant to the obligations attempted to be imposed pursuant to the Restated Sublicensing Agreement, Exhibit G-1 hereof.

77.     The insertion was made on January 13, 2006, after the signatures of the Chairman and Secretary of THA, as well as the opinion of the THA Solicitor, had already been provided.

78.     The said insertion was accomplished without the approval, or even the knowledge of the Board of THA, and was made by the attorneys to appear as though it was part of version 13 of Exhibit G-1.

79.     Furthermore, neither the Executive Director, Solicitor or Board Chairman, knew of, let alone approved, the "slipped in" substituted pages.

80.     Exhibit G-1 was version 13 of the Restated Sublicensing Agreement (Exhibit G) and, in order to disguise the insertion as described above in paragraph 71, no new version 14 was shown.

81.     The actions described in paragraphs 74-80, with the resultant backdating of the insertion, were harmful to THA, and constituted illegal and fraudulent actions by those involved in the scheme.

VIII.   The Substantial Changes Not Approved by THA's Board

82.     As stated in paragraphs 27-37 above, the only legal resolution passed by THA was that of December 21, 2005, and the considerable changes in the structure of the deal

subsequent to that date, including the fraudulent insertion described in paragraphs 74-80, required the prior approval of the Board of THA, which did not occur.

83.     Defendants were aware that on and after December 28, 2005, there were substantial changes to the arrangement that had been presented to THA on December 21, 2005, and new documents, as well as substantial amendments to the Restated Sublicensing Agreement (Exhibit G hereof) required approval of THA's Board.

84.     Despite CIT's recognition as set forth in paragraph 83, Defendants proceeded at their own risk to advance $25 million to Barlow and its creditors.

85.     While the Resolution of THA of December 21, 2005, Exhibit G-2 hereof, purported to delegate authority to approve changes to the documents approved by THA at that time, said delegation was ineffective to validate the various documents executed in January 2006 for the following reasons:  (a) the arrangement that was before THA on December 21, 2005 subsequently was substantially changed from and after December 28, 2005; (b) THA had no authority to delegate its obligation under the law to consider and approve agreements at an open public meeting; (c) alternatively, the changes were not approved by unanimous action of the Chairman, Executive Director and Solicitor.

86.     In addition, the "slipping in" of the changes to paragraph 15 of Exhibit G-1, as set forth above in paragraphs _74-80 above, was not ever approved by the three persons whose approval was required for any change, even if such delegation had been proper.

IX.     The Documents Impose No Liability on THA

87.     The Restated License Agreement in the form of Exhibit G-1 hereto, recognized that any payments required of THA were dependant upon completion of construction by Barlow,

as per the provisions of the recitals in said Agreement, including the sixth and seventh "Whereas" clauses.

88.    The Equipment Agreement provided in Section 1.02 that all contracts related to the construction project were to be considered "in pari materia" and further, that if any contract between Barlow and THA conflicted with the provisions of the Equipment Agreement, the provisions of the Equipment Agreement were to control.

89.    Exhibit D, the original Sublicense Agreement, was made part of the Equipment Agreement by the provisions of Section 2.02 thereof.

90.    Among the many conflicts between Exhibit D and Exhibit G-1 are provisions of Exhibit D which have dramatically lower fees, and which do not require payment of any fees for the Combustion Technology until completion of Barlow's work, something which never did occur.

91.    Additionally void and of no effect are the provisions of paragraph 6(d) of Exhibit G-1, in that any payments pursuant to that paragraph cannot be "operating expenses," and the averments of Plaintiff County of Dauphin at paragraphs 117-119, infra, are herewith incorporated by reference.

92.    Even overlooking the impropriety of the inserted sentence, as per paragraphs 74-80 above, said inserted sentence itself fails to permit assignment of Exhibit G-1 to Aireal in accordance with the following:  (a) paragraph 1(a) of Exhibit G-1 defines a "Permitted Assignee" as a wholly-owned LLC of the Licensor/Seller; (b) paragraph ii of the Consent to Assignment, Exhibit H, states:  "All references to Licensor/Seller in the Sublicense shall be deemed to refer to Assignee," which is intended to be Aireal; (c) Aireal, neither at the time nor since that time, ever

had a "wholly-owned LLC;" (d) thus, there was no "Permitted Assignment" since the required "Permitted Assignee" did not exist; (e) any such assignment was illusory and not in accordance with the wording of Exhibit H and Exhibit G-1.

57.93. In addition, at the time involved, January, 2006, Barlow was in an insolvent financial condition and had little or no net assets; thus, its transfer of the Combustion Technology to Aireal, which was purported by CIT to have a value of $25 million, while retaining all its liabilities, including substantial liabilities to THA, constituted a fraudulent conveyance pursuant to 12 Pa. C.S.A. §5101 et seq., which voids the transfer of said technology to Aireal and requires it to be re-transferred to Barlow.

58.94. Even if the Restated Sublicensing Agreement (Exhibit G-1) was valid, the fact that the licensor/seller thereunder, Barlow Projects Harrisburg, LLC, made a material liquidation of its assets (the Combustion Technology) constituted a default under Section 12(b) of said Agreement after which THA had the right to, and did, terminate the Agreement, and, pursuant to paragraph 14.c. thereunder, THA continued to have the right to utilize the Combustion Technology without any further liability or payment obligations.

59.95. Specifically with reference to the Restated Sublicensing Agreement (Exhibit G-1), paragraph 6.d, whereby THA was purportedly obligated to make all payments irrespective of the fact that the Facility was not in a condition that it could be operated, and thus would be of no value to THA, is a further *ultra vires* act which renders the Agreement null and void.

60.96. THA was also without any legal authority to agree to make payments to CIT under conditions set forth in paragraph 6(d), and particularly subsections (iii) and (iv), which

required payments to be made irrespective of whether or not the work had been properly completed or whether THA received any benefit therefrom.

~~61.~~97.  THA had no authority to agree to the provisions of Section 8(b), in that the Agreement was in conflict with the MAA, which precludes THA from agreeing to the onerous and unreasonable provisions thereof.

~~62.~~98.  THA had no authority to restrict its costs and expenses, as provided in Section 8(b)(ii), and ~~such~~ those provisions of said Agreement ~~was~~ were in conflict with the MAA.

~~63.~~99.  The Restated Sublicensing Agreement (Exhibit G-1) is additionally void and of no effect, in that THA has no authority under the MAA to agree to the provisions of paragraph 12(e) and thereby waive its right and obligation to challenge or contest any action to be taken by CIT.

~~64.~~100.       The Barlow, Aireal, CIT Documents, executed in January, 2006 (Exhibits G-1, H and I), must be rendered void and unenforceable in order to protect the citizens and taxpayers of Harrisburg and Dauphin County from these unjust, ill-considered, and extortionate contracts.

~~65.~~101.       After THA failed to make the payment from its own funds as purportedly required under the Restated Sublicensing Agreement (Exhibit G-1), CIT and Aireal required THA to execute a Forbearance Agreement, Exhibit I attached hereto, which repeats the *ultra vires* provisions of the Restated Sublicensing Agreement concerning the obligation to pay even if, as is the case, no value had been received by THA; renunciation of defenses; and agreement to injunctive relief.

66.102.        Injunctive relief on behalf of CIT is improper, since any entitlement is compensable in money damages that are easily calculated.

67.103.        The Forbearance Agreement (Exhibit I) is invalid and void for the same reasons the Restated Sublicensing Agreement (Exhibit G-1) is, since it is based on said Exhibit G-1 which itself is null and void.

68.104.        The agreements entered into by THA, Exhibits G-1, H, I and J, are *ultra vires* and invalid because same are in violation of the MAA, Section 5617, in that they would impair the security of bondholders of THA and agreements with them or for their benefit.

## COUNT I – DECLARATORY JUDGMENT

### THA V. CIT and AIREAL

69.105.        THA incorporates in full the proceeding paragraphs.

70.106.        As set forth above, THA had no authority or legal basis for entering into the Barlow, Aireal, CIT Documents of January 10, 11 and 12, 2006 and the Forbearance Agreement, same being Exhibits G-1, H, I and J:

    a.        Same are in violation of the MAA;

    b.        Same are void for lack of consideration;

    c.        Same are unjust, ill-considered and extortionate contracts from which the citizens and taxpayers of Harrisburg and Dauphin County must be protected.

71.107.        An actual controversy exists as to the validity of the said agreements, Exhibits G-1, H, I and J, since CIT and Aireal have clearly threatened to bring suit as per its letter of November 15, 2007, attached hereto as Exhibit J.

~~72.~~108.        Under the provisions of the Restated Sublicensing Agreement (Exhibit G-1) and the Forbearance Agreement (Exhibit I), CIT and Aireal ~~has~~ have threatened to shut down the operations of the Facility, which will cause untold losses to THA, the City of Harrisburg, the County, the bondholders of THA and the citizens and taxpayers of Harrisburg, Dauphin County and surrounding areas who must use the Facility.

WHEREFORE, THA requests judgment against Defendants CIT and Aireal, declaring that:

(a)    CIT and its alter ego, Aireal, lack capacity to institute suit in Pennsylvania due to CIT's failure to have obtained a certificate of authority pursuant to the Foreign Business Corporation Law, 15 Pa. C.S.A. 4121(a) and 4141(a);

(b)    ~~the Barlow, Aireal, CIT Documents and the Forbearance Agreement, namely~~ Exhibits G-1, H, I and J, are null and void as *ultra vires*, contrary to law, unconscionable, lacking consideration, and against public policy;

(c)    neither CIT or Aireal is entitled to any money from THA;

(d)    CIT and Aireal are enjoined from pursuing any claim against THA based on ~~The Barlow, Aireal, CIT Documents or the Forbearance Agreement (~~Exhibits G-1, H, I and J~~)~~, or otherwise;

(e)    the transfer of the technology from Barlow to Aireal was a fraudulent transfer, from which Aireal acquired no legal right to the technology;

(f)    CIT and Aireal are precluded from enforcing ~~the Barlow, Aireal, CIT Documents~~Exhibits G-1, H, I and J on the bases that they come into court with unclean hands, and because they have engaged in a subterfuge of convoluted

documents in an effort to cover up the real intent to impose liability on THA as a

guarantor of Barlow's loan, for which THA had no authority under the MMA and

received no consideration; and

(g)　　　THA should receive such other and further relief as may be just, necessary and

proper.

## COUNT II – PERMANENT INJUNCTION

### THA v. CIT and AIREAL

~~73.~~109.　　　　THA incorporates in full the proceeding paragraphs.

~~74.~~110.　　　　As set forth above, THA had no authority or legal basis for entering into

the Barlow, Aireal, CIT Documents of January 10, 11 and 12, 2006, or the Forbearance

Agreement, same being Exhibits G-1, H, I and J:

　　　a.　　　Same are in violation of the MAA;

　　　b.　　　Same are void for lack of consideration;

　　　c.　　　Same are unjust, ill-considered and extortionate contracts from which the

　　　　　　citizens and taxpayers of Harrisburg and Dauphin County must be

　　　　　　protected.

~~75.~~111.　　　　Under the provisions of the Restated Sublicensing Agreement and the

Forbearance Agreement, CIT and Aireal claim as an alleged legal remedy the shut down of the

Facility, which will cause untold losses to THA, the City, the County, the bondholders of THA

and the citizens and taxpayers of Harrisburg, Dauphin County and surrounding areas who must

use the Facility.

WHEREFORE, THA requests:

(a)     Permanent injunctive relief against CIT and Aireal through an Order permanently

enjoining CIT and Aireal from enforcing, directly or indirectly, any of the

provisions of the agreements attached to the Complaint as Exhibits G-1, H, I and

J;

(b)     Such other and further relief as may be just, necessary and proper.

## COUNT III - DECLARATORY JUDGMENT

## COUNTY OF DAUPHIN V. CIT AND AIREAL

~~76.~~112.          The County hereby incorporates by reference the averments set forth in

the preceding paragraphs 1 through ~~75~~111.

~~77.~~113.          The County, as guarantor of certain of the Retrofit Bonds issued pursuant

to the Retrofit Indenture, and as guarantor of certain other obligations of THA under the Retrofit

Indenture, all pursuant to the County Guarantees, has a direct, immediate and pecuniary interest

in the proper application of funds secured by the Retrofit Indenture and the performance by THA

of its obligations thereunder and under the Reimbursement Agreement.  The misapplication of

funds secured by the lien of the Retrofit Indenture or the diversion thereof for purposes other

then those specified in the Retrofit Indenture will have a direct, immediate and adverse impact

upon the interests of bondholders and of the County as guarantor of obligations held by such

bondholders pursuant to the County Guarantees.  Said bondholders and the County are

beneficiaries of the lien and related covenants of THA established by the Retrofit Indenture.

~~78.~~114.          Amendment No. 1 (Exhibit E), pursuant to which THA satisfied in full its

obligation to pay license fees, thereby securing its right to use the Combustion Technology

pursuant to the Original Sublicensing Agreement (Exhibit D), was entered into, pursuant to its

terms, in part, for the benefit of the guarantors of THA⁺'s debt, including the County (see fourth

Whereas clause of Amendment No. 1 - Exhibit E).

79.115.          The Retrofit Indenture establishes a lien upon all monies and funds

applicable to the Facility and requires that the application and disbursement of such funds shall

be in accordance with the provisions of the Retrofit Indenture.  Such funds are also subject to the

prior lien of the Trust Indenture, dated as of August 1, 1998 (the "1998 Indenture") between

THA and Chase Manhattan Trust Company, National Association (now JP Morgan Trust

Company, National Association), pursuant to which certain of the Guaranteed Resource

Recovery Facility Refunding Revenue Bonds, Series A of 1998 (the "1998 A Bonds") remain

outstanding.  The Retrofit Indenture and the 1998 Indenture are sometimes hereinafter referred to

collectively as the "Indentures."

80.116.          The Retrofit Indenture defines the terms "Receipts and Revenues" and

"Operating Expenses" as follows:

> "Receipts and Revenues" shall mean any and all rates, rents, fees
> and charges established or to be established, levied and collected in
> connection with, and all other payments, receipts and revenues of
> whatever kind or character arising from, the operation or
> ownership of the Waste Management Facility by the Authority or
> any part thereof, any income earned on the moneys or investments
> on deposit in the Debt Service Fund, Debt Service Reserve Fund,
> Construction Fund, Revenue Fund, Redemption Fund and any
> sinking, purchase or analogous fund created hereunder.  The term
> "Receipts and Revenues" shall include Qualified Swap Revenues
> for purposes of meeting the rate calculation covenant set forth in
> Section 7.01 hereof.
>
> "Operating Expenses" shall mean Administrative Expenses,
> Authority Utility Expenses and all expenses of the Waste
> Management Facility Manager (excluding depreciation) required in

operating and maintaining the Waste Management Facility
pursuant to the Management Agreement, including, in each case,
without intending to limit the generality of the foregoing:

A.    Expenses of operation, maintenance, repair,
alteration, insurance and inspection, and any sums
payable periodically to any Person or other entity
pursuant to any agreement related to the Waste
Management Facility;

B.    Expenses of managerial, supervisory, labor,
employee training, administrative, engineering,
financial, architectural, legal, public relations and
auditing services;

C.    Sums payable to any Person or other entity which
sums, under sound accounting and/or engineering
practice, as the case may be, constitute expenses of
operation and maintenance;

D.    All taxes, assessments and charges, or contributions
or payments in lieu thereof, including, without
intending to limit the generality of the foregoing,
income, profits, property, franchise and excise
taxes;

E.    All expenses of complying with applicable laws and
applicable permits, including the costs and expenses
of preparing and submitting reports and posting
bonds required thereunder or in connection
therewith; and

F.    Required funding of the Operating Reserve Account
pursuant to Section 6.01(b) of the 1998 Indenture or
hereunder.

Retrofit Indenture, Section 1.02.

The terms "Receipts and Revenues" and "Operating Expenses" are similarly defined

within the 1998 Indenture. A true and correct copy of excerpts of the Retrofit Indenture is

attached hereto and marked Exhibit K. Because of its volume the entire document is not

included at Exhibit K.

~~81.~~117.          The lien of the Retrofit Indenture and the lien of the 1998 Indenture attach to all Receipts and Revenues of the Facility and such funds may be applied and paid only pursuant to the provisions thereof.  Under both Indentures, Receipts and Revenues must be applied first to payment of Operating Expenses and then to payment of debt service and other purposes as specified in the Indentures and pursuant to the priorities therein, all for the benefit of the bondholders, bond insurers and guarantors, including the County.

~~82.~~118.          License fees to secure use of the Combustion Technology at the Facility, under normal circumstances, may be an appropriate Operating Expense.  However, ~~by implication,~~ the Operating Expenses to be incurred and paid by THA must be only those that are reasonable and necessary for operation of the Facility.  The payment of duplicate and excessive license fees pursuant to the Restated Sublicensing Agreement (Exhibit G) are not reasonable or necessary and payment thereof by THA would constitute a waste of assets, a violation of the lien and provisions of the Indentures, and without limiting the generality of the foregoing, would constitute a violation of the following specific provisions of the Retrofit Indenture:

> (a)     Under section 7.07 of the Retrofit Indenture: "So long as any of the Bonds . . . secured hereby are Outstanding, none of the Receipts and Revenues or any property pledged hereby shall be used for any purpose other then as provided in this Indenture, the 1998 Indenture . . . and no contract or contracts will be entered into or any action taken by which the rights of the Trustee or of the Registered Owners, . . . might be impaired or diminished.  This Indenture pledges and grants a security interest in the Receipts and Revenues and Qualified Swap Revenues.  The Authority covenants to apply the Receipts and Revenues and Qualified Swap Revenues, to the extent available, to pay principal of and interest on Bonds issued under this Indenture . . . ."

> (b)     Under section 7.17 of the Retrofit Indenture, THA covenants that ". . . it will operate or cause the Waste Management

Facility Manager to operate the Waste Management Facility in **an efficient and economical manner**. . . ." (Emphasis added.)

(c)      Under section 7.19 of the Retrofit Indenture, THA covenants and agrees that ". . . so long as any of the Bonds, Parity Obligations or Subordinated Obligations secured hereby shall be Outstanding, none of the Receipts and Revenues will be used for any purpose other than as provided or allowed in this Indenture, and that no contract or contracts will be entered into or any action taken to impair or diminish the rights of Registered Owners of the Bonds, Parity Obligees or Subordinated Obligees."

83.119.      To be obligated, or to pay the so-called "license fees" under the Restated Sublicensing Agreement, where THA, pursuant to the Original Sublicensing Agreement held the right to use the Combustion Technology for the life of the Project, and where THA had fully paid all license fees required with respect thereto under Amendment No. 1, violates the covenants of the Authority as set forth in the Retrofit Indenture and thus such payments cannot be made from Facility Receipts and Revenues, which are subject to the liens of the Indentures.

84.120.      As previously pleaded, the payment of license fees under the Restated Sublicensing Agreement is a guise and a ruse whereby THA was placed in the position of providing security for the extension of credit by Defendants to Barlow. Such action is *ultra vires* under THA's Charter and the MAA and also is not a proper purpose for application of Receipts and Revenues subject to the liens of the Indentures.

85.121.      The Reimbursement Agreement was entered into, in part, in order to induce the County to execute and deliver the County Guarantees.

86.122.      Under the Reimbursement Agreement, THA agreed, among other things, to pay to the County, on demand, solely from moneys generated in connection with the Facility, amounts at any time paid by the County under the County Guarantees.

87.123.        Under the Reimbursement Agreement, payments by THA to the County are subordinate to other payment obligations of THA, including payments designated as "Operating Expenses" under the Indentures.

88.124.        Under the Reimbursement Agreement, THA agreed that it would not incur any debt on the Facility that increases the annual debt service requirements for any year during which the County Guarantees are outstanding without approval by the County.

89.125.        Under the Reimbursement Agreement, THA agreed to provide copies of proposed documentation related to additional debt on the Facility prior to execution.

90.126.        The Retrofit Indenture, the 1998 Indenture, the County Guarantees and the Reimbursement Agreement were in existence prior to the Restated Sublicensing Agreement and other Barlow, Aireal, CIT Documents executed in and around January 10, 11 and 12, 2006 (Exhibits G, H, and I) and prior to execution of the Forbearance Agreement in 2007 (Exhibit I).

91.127.        UCC Financing Statements containing notice of the liens of the Indentures are filed of record in the Office of the Secretary of the Commonwealth.

92.128.        The County avers, on information and belief, that CIT and Aireal had actual knowledge of the County Guarantees and the existence of the Indentures and Reimbursement Agreement prior to execution and delivery of the Restated Sublicensing Agreement and other Barlow, Aireal, CIT Documents in January, 2006 and prior to execution and delivery of the Forbearance Agreement in 2007.

93.129.        In the alternative, CIT and Aireal should have known through the exercise of reasonable diligence of the County Guarantees and of the existence and terms of the

Indentures and Reimbursement Agreement prior to execution of the Barlow, Aireal, CIT

Documents in January, 2006.

94.130.       The County's consent as required under the Reimbursement Agreement

was never sought, nor did the County have any knowledge of the Barlow, Aireal, CIT

Documents prior to their execution. Furthermore, neither the County nor its agents were

provided with a complete description of the transaction, including (i) the Barlow, Aireal, CIT

Documents prior to their execution; (ii) the original and amended documents they purported to

amend and/or restate; (iii) the value of the Combustion Technology; and (iv) the prior payment

by THA of the sublicense fees for the Combustion Technology.

95.131.       CIT's declaration of default against THA (Exhibit J) and its threats to

exercise its alleged rights and remedies under the Restated Sublicensing Agreement (Exhibit G)

and Forbearance Agreement (Exhibit I) place the bondholders of the Retrofit Bonds at risk,

places the County's Guarantees at risk, and may prevent THA from making its required

reimbursement payments to the County under the Reimbursement Agreement, all to the

detriment of the County.

96.132.       Because of the County Guarantees, the Barlow, Aireal, CIT Documents, if

valid and enforceable, result, through subterfuge, in placing the County in the role of de facto

guarantor to CIT for repayment of the funds CIT loaned to Barlow.

97.133.       The Barlow, Aireal, CIT Documents are invalid and void as *ultra vires*,

contrary to law, unconscionable, lacking consideration, and  against public policy.

98.134.       The Barlow, Aireal, CIT Documents and the payment of so-called "license

fees" by THA thereunder violates the terms and liens of the Indentures of which the Defendants,

upon information and belief had actual knowledge, or upon the exercise of reasonable diligence should have had actual knowledge.

99.135.        The Forbearance Agreement (Exhibit I), existing and executed only because of the Restated Sublicensing Agreement in the first place, is likewise *ultra vires*, contrary to law, unconscionable and against public policy.

100.136.        The County does not have an adequate remedy at law.

WHEREFORE, the County requests judgment against CIT and Aireal:

    (a)   declaring that the Barlow, Aireal and CIT Documents (Exhibits G, H, and I) and the Forbearance Agreement (Exhibit I) are null and void;

    (b)   declaring that neither CIT nor Aireal is entitled to payment of any funds, by THA from Receipts and Revenues subject to the liens of the Indentures;

    (c)   enjoining CIT and Aireal from pursuing any claims against THA based on the Barlow, Aireal, CIT Documents (Exhibits G, H, and I); and

    (d)   awarding such other and additional relief as may be just, necessary and proper.

## COUNT IV - PERMANENT INJUNCTION

## COUNTY OF DAUPHIN V. CIT AND AIREAL

101.137.        The averments of paragraphs 1 through 98 are hereby incorporated by reference.

WHEREFORE, the County requests that permanent injunctive relief be entered against CIT and Aireal, permanently enjoining them from enforcing, or attempting to enforce, directly or indirectly, any of the provisions of the Barlow, Aireal, CIT Documents or the Forbearance Agreement.

Respectfully submitted,

**GOLDBERG KATZMAN, P.C.**

Date: _____  By: _____/S/
Ronald M. Katzman, Esquire

Ronald M. Katzman, Esquire (I.D. #07198)
Royce L. Morris, Esquire (I.D. #64310)
Steven E. Grubb, Esquire (I.D. #75897)
~~David M. Steekel, Esquire (I.D. #82340)~~
320 Market Street, P.O. Box 1268
Harrisburg, PA 17108-1268
Telephone: (717) 234-4161
*Attorneys for The Harrisburg Authority*


**METTE, EVANS & WOODSIDE**

Date: _____  By: _____
_____/S/Charles B. Zwally, Esquire

Charles B. Zwally, Esquire (I.D. # 07137)
Matthew E. Hamlin, Esquire (I.D. # 86142)~~Daniel L. Sullivan, Esquire (I.D. # 34548)~~
3401 North Front Street
P. O. Box 5950
Harrisburg, PA 17110-0950
(717) 232-5000 - Phone
(717) 236-1816 - Fax

Attorneys for County of Dauphin

164929.1

## VERIFICATION

I hereby acknowledge that I have read the foregoing Complaint and that the facts stated therein are true and correct to the best of my knowledge, information, and belief.

I understand that any false statements herein are made subject to penalties of 18 Pa. C.S. §4904, relating to unsworn falsification to authorities.

THE HARRISBURG AUTHORITY

Date: _____     By: _____

**VERIFICATION**

I hereby acknowledge that I have read the foregoing Complaint and that the facts stated therein are true and correct to the best of my knowledge, information, and belief.

I understand that any false statements herein are made subject to penalties of 18 Pa. C.S. §4904, relating to unsworn falsification to authorities.


COUNTY OF DAUPHIN

Date: _____     By: _____

# UNITED STATES DISTRICT COURT FOR
# THE MIDDLE DISTRICT OF PENNSYLVANIA

THE HARRISBURG AUTHORITY,　　　　　:

　　　　　　　　　　　　　　　　:

　　　　　　　　　　and　　　　　　:

　　　　　　　　　　　　　　　　:

COUNTY OF DAUPHIN,　　　　　　　:　　No. 4:08-cv-00180-JEJ

　　　　　　　　　Plaintiffs,　　　:

　　　　　　　　　　　　　　　　:

　　　　　　　　　v.　　　　　　　:

　　　　　　　　　　　　　　　　:

CIT CAPITAL USA, INC.　　　　　　:

　　　　　　　　　　　　　　　　:

　　　　　　　　　and　　　　　　:

　　　　　　　　　　　　　　　　:

AIREAL TECHNOLOGIES OF　　　　　:

HARRISBURG, LLC,　　　　　　　　:

　　　　　　　　　Defendants.　　　:~~Goldberg Katzman, P.C.~~

~~Ronald M. Katzman, Esquire (I.D. # 07198)~~
~~Royce L. Morris, Esquire (I.D. # 64310)~~
~~Steven E. Grubb, Esquire (I.D. # 75897)~~
~~David M. Steckel, Esquire (I.D. # 82340)~~

~~Attorneys for The Harrisburg Authority~~
~~320 Market Street, P. O. Box 1268~~
~~Harrisburg, PA  17108-1268~~
~~(717) 234-4161~~

~~Mette, Evans & Woodside~~
~~Charles B. Zwally, Esquire (I.D. # 07137)~~
~~Daniel L. Sullivan, Esquire (I.D. # 34548)~~
~~Attorneys for Dauphin County~~
~~3401 North Front Street~~
~~Harrisburg, PA  17110~~
~~(717)232-5000~~

| | | |
|---|---|---|
| ~~THE HARRISBURG AUTHORITY~~ | ~~:~~ | ~~THE COURT OF COMMON PLEAS OF~~ |
| ~~One Keystone Plaza, Suite 104, Front &~~ | ~~:~~ | ~~DAUPHIN COUNTY, PENNSYLVANIA~~ |
| ~~Market Streets, Harrisburg, PA  17101~~ | ~~:~~ | |
| | ~~:~~ | ~~CIVIL DIVISION~~ |
| ~~and~~ | ~~:~~ | |
| | ~~:~~ | ~~NO.:~~ |
| ~~COUNTY OF DAUPHIN~~ | ~~:~~ | |
| ~~Second and Market Streets~~ | ~~:~~ | |

| Harrisburg, PA 17101 | : | Action for Declaratory Judgment |
|---|---|---|
| ————————— Plaintiffs | : | (Pa. R.C.P. 1601) |
| ——————— v. | : | |
| | : | |
| CIT CAPITAL USA, INC. | : | |
| 505 Fifth Avenue | : | |
| New York, NY  10017 | : | |
| | : | |
| and | : | |
| | : | |
| AIREAL TECHNOLOGIES OF | : | |
| HARRISBURG, LLC | : | |
| c/o CT Corporation System | : | |
| 1515 Market Street, Suite 1210 | : | |
| Philadelphia, PA  19102 | : | |
| ——————— Defendants | : | |

## NOTICE TO PLEAD

YOU HAVE BEEN SUED IN COURT.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this Amended Complaint is served, by entering a written appearance personally or by attorney and filing in writing with the Court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the Court without further notice for any money claimed in the Amended Complaint or for any other claim or relief requested by the Plaintiff.  You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

DAUPHIN COUNTY LAWYER REFERRAL SERVICE
213 N. Front Street
Harrisburg, PA  17101
(717) 232-7536

## NOTICIA

Le han demandado a usted en la corte.  Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene viente (20) dias de plazo al partir de la fecha de la demanda y la notificacion.  Usted debe presentar una apariencia escrita o en persona o por abogado y archivar en la corte en forma escrita sus defensas o sus objeciones a las demandas en

contra de su persona.  Sea adisado que si usted no se defiende, la sin previo aviso o notificacion y por cualquier quja o puede perder dinero o sus propiedades o otros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATAMENTE.  SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

DAUPHIN COUNTY LAWYER REFERRAL SERVICE
213 N. Front Street
Harrisburg, PA  17101
(717) 232-7536