IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE HARRISBURG AUTHORITY, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | Civil No. 4:08-cv-180 |
| | : | |
| v. | : | |
| | : | Hon. John E. Jones III |
| CIT CAPITAL USA, INC., *et al.*, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM OPINION**

June 27, 2012

## I.    FACTUAL BACKGROUND

The case *sub judice* involves The Harrisburg Authorities' ("THA") project

to upgrade and modernize the Harrisburg Materials, Energy, Recycling and

Recovery Facility, a trash-to-steam waste treatment facility ("the incinerator").

(Doc. 35 ¶¶ 1, 10). To finance the incinerator project, THA issued a series of

bonds, including its Guaranteed Resource Recovery Facility Revenue Bonds,

Series D of 2003 (the "2003D Bonds"), Guaranteed Federally Taxable Resource

Recovery Facility Revenue Bonds, Series E of 2003 (the "2003E Bonds"), and

Guaranteed Federally Taxable Resource Recovery Facility Revenue Bonds, Series

F of 2003 (the "2003F Bonds"), under a Trust Indenture dated December 1, 2003

(the "Retrofit Indenture") between THA and Commerce Bank/Pennsylvania, National Association.  (*Id.* ¶ 11).  Dauphin County ("Dauphin" or the "County"), recognizing the countywide benefits of the project and its responsibilities for municipal waste planning, entered into agreements with THA to provide secondary guarantees for the 2003D Bonds and 2003E Bonds, for a total amount not to exceed $110,980,000.   (*Id.* ¶ 12).

THA contracted with Barlow Projects, Inc. ("Barlow") to design the incinerator, retrofit the facility, and provide state-of-the-art "Combustion Technology."  (*Id.* ¶¶ 14, 16.)  The agreement between THA and Barlow was memorialized in three separate contracts in May 2004.  In the "Equipment Contract," THA agreed to pay almost $52 million for the proprietary and other specialized equipment necessary to retrofit the incinerator. (*See id.* ¶ 18(I)).  In the "Services Contract," THA agreed to pay almost $13 million to Barlow for engineering, construction, and start-up of the incinerator. (*See id.* ¶ 18(II)). Finally, in the "Sublicensing Agreement," THA purchased a nonexclusive license for the use Barlow's proprietary Combustion Technology which was to be installed in the incinerator.  (*See id.* ¶ 18(III)).

The retrofit of the incinerator was originally scheduled to be completed in twenty-four months, and the facility was to be restarted in late 2005. (*See id.* ¶ 21).

This was not to be.  Plaintiffs THA and Dauphin allege that Barlow was negligent in its work, breached its contract with THA, and that Barlow's design flaws, unsuitable equipment, construction delays, poor project management, and lack of financial resources prevented the incinerator project from being completed.[1]  (*Id.* ¶ 17).  In late fall of 2005, Barlow was increasingly behind schedule and out of money, despite having received substantially all of the contract price from THA. (*Id.* ¶¶ 22-23).  Barlow eventually obtained additional capital in the amount of $25 million from defendant CIT Capital USA Inc ("CIT").  (*Id.* ¶ 24).[2]

To secure CIT's funding, a "Restated Sublicensing Agreement" ("RSA") replaced the original Sublicensing Agreement ("SLA").  (*See id.* ¶ 26.)  Through the RSA, Barlow Projects Harrisburg, LLC ("Barlow"), the Barlow entity which had licensed the rights to the Combustion Technology from Barlow for purposes of the incinerator project, licensed that technology to THA in exchange for $25 million in fees. (*See* Doc. 36 ¶¶ 19, 24-25).  Barlow then assigned its rights to payment from THA to a newly created Barlow entity, Aireal Technologies of

---

[1] THA's claims against Barlow and other entities were the subject of another suit initiated before this Court, *The Harrisburg Authority v. Barlow Projects, Inc., et al.*, 07-cv-1520, which was ultimately settled in November 2009.

[2] Plaintiffs allege that the series of agreements between THA, Barlow, and CIT, which were consummated in order to obtain this additional funding, were a veiled attempt to force THA to guarantee CIT's loan to Barlow through *ultra vires* and unenforceable contracts, and it is these contracts that Plaintiffs seek to have declared void.  (*Id.* ¶¶ 25-27).

Harrisburg, LLC ("Aireal").  (*Id.* ¶ 24(b)).  THA consented to this assignment.

(*Id.* ¶ 24(c)).  Finally, CIT purchased Barlow's interest in Aireal for $25 million.

(*Id.* ¶ 24(e)).  The $25 million from CIT was used by Barlow to continue work on

the incinerator project.  (*Id.* ¶ 28).  As a result of these transactions, THA allegedly

became obligated to pay the restated $25 million license fee to Aireal, which is

now owned by CIT.

Plaintiffs allege that the RSA is unenforceable for lack of consideration

because THA had already paid Barlow $2.7 million in full satisfaction of the

original license fee six months prior to entering into the RSA.  (Doc. 35 ¶¶ 40, 50-

51).  Plaintiffs also assert that THA's execution of the RSA was an *ultra vires* act

in violation of THA's authority and Pennsylvania's Municipal Authorities Act

("MAA"), 53 PA. CONS. STAT. § 5601, *et seq.,* in that THA agreed to pay for a

license for which it had already paid in full and, effectively, agreed to guarantee

the debts of its private party contractor.  (*Id.* at ¶¶ 52, 70).  Plaintiffs also contend

that, pursuant to Amendment Number 9 ("Amendment 9") to the Equipment

Contract, Barlow and its associated entities assumed all of THA's payment

obligations, and that THA's only obligation was to forward payments from Barlow

to CIT.  (*Id.* ¶ 57, 61).

In March 2007, THA failed to make payments to Aireal as purportedly

4

required by the RSA.  (Doc. 35 ¶ 101; Doc. 36 ¶¶ 31, 32.)  In June 2007, THA, Aireal, and CIT entered into a Forbearance Agreement, which acknowledged THA's obligations under the RSA.  (Doc. 35 ¶ 101).  Plaintiffs allege that the Forbearance Agreement merely repeats the invalid and unenforceable provisions of the RSA and therefore it is void.  (*Id.* ¶¶ 101, 103).  Upon expiration of the forbearance period in November of 2007, CIT and Aireal provided notice to THA of its default under the RSA, gave THA the required sixty-day (60) period to cure the default, and notified THA of their intent to seek legal remedies if the default was not cured.  (*Id.* ¶ 107, Ex. J.)

Before expiration of the sixty-day grace period, Plaintiffs THA and Dauphin filed suit asserting two claims against CIT and Aireal: one seeking a declaratory judgment that, *inter alia*, the RSA is void and unenforceable, (*id.* at Counts I, III), and one seeking a permanent injunction enjoining CIT and Aireal from enforcing, *inter alia*, the RSA.  (*Id.* at Counts II, IV).  CIT and Aireal both counterclaimed against THA for breach of the RSA in Counts I-III, promissory estoppel in Count IV, unjust enrichment in Count V, injunctive relief in Count VI, fraud in Count VII, and tortious interference with contract in Count VIII.  (Doc. 36).

## II.    PROCEDURAL HISTORY

The instant suit was originally filed in the Dauphin County Court of

Common Pleas on January 3, 2008.  (Doc. 1, Ex. 1).  Defendants[3] timely filed a

notice of removal with this Court on January 30, 2008.  (Doc. 1).  A motion to

remand the case to state court filed by THA on February 14, 2008 was denied on

May 30, 2008.  (Doc. 26).  Thereafter, an amended complaint was filed by THA on

October 31, 2008, (doc. 35), and an amended answer and counterclaim was filed

by CIT and Aireal on November 1, 2008.  (Doc. 36).  THA and Dauphin then filed

answers to CIT's counterclaim on December 11, 2008.  (Docs. 42, 43).  On March

11, 2009, the Court granted Dauphin's motion to amend/correct its answer to the

counterclaim to assert the affirmative defense of governmental immunity, (doc.

56), which it subsequently filed on March 18, 2009.  (Doc. 58).

After the filing of a motion to compel on March 30, 2009, (doc. 59), we

referred the motion and any forthcoming discovery disputes to Magistrate Judge J.

Andrew Smyser.  (Doc. 70).  On July 14, 2009, Judge Smyser granted in part and

denied in part the motion to compel.  (Doc. 78).  Subsequently, THA filed an

appeal of the magistrate judge's decision on July 24, 2009, (doc. 79), which we

affirmed on June 14, 2010.  (Doc. 96).  On November 3, 2010, THA and CIT filed

cross motions for summary judgment, (docs. 102 and 121), which we denied in

their entirety on May 18, 2011.  (Doc. 149).

---

[3] "Defendants" shall refer collectively to CIT and Aireal.

Also on November 3, 2010, Dauphin filed a motion for summary judgment in its capacity as counterclaim Defendant.  (Doc. 105).  Dauphin also filed a motion for partial summary judgment in its capacity as Plaintiff, (doc. 112), and supporting brief, (doc. 114), on November 3, 2010.  CIT filed a cross motion for summary judgment on November 3, 2010.  (Doc. 119).  After full briefing of the motions for summary judgment, we issued a memorandum and order on June 21, 2011 granting Dauphin's motion for summary judgment in its capacity as counterclaim Defendant, denying Dauphin's motion for partial summary judgment in its capacity as Plaintiff, and denying CIT's motion for summary judgment against Dauphin on its claims.  (Doc. 150 at 30-31).

Thereafter, Dauphin filed a motion in limine, (doc. 162), on December 6, 2011, and together with THA filed a motion in limine regarding whether undisputed facts admitted at summary judgment are deemed admitted for purposes of trial.  (Doc. 164).  Also on December 6, 2011, CIT filed a motion in limine concerning inadmissible parol evidence.  (Doc. 166).  After full briefing on the motions, we issued an order dated December 28, 2011 denying Dauphin's motion in limine to preclude the testimony of Thomas F. Smida Esq. ("Smida"), denying THA's and Dauphin's motion in limine regarding whether undisputed facts admitted at summary judgment are deemed admitted for purposes of trial, and

7

denying CIT's motion in limine regarding inadmissible parol evidence.  (Doc. 176 at 13).

Moreover, on December 28, 2011, David Unkovic, the now former Receiver for the City of Harrisburg (the "City"), filed a Motion to Intervene pursuant to Federal Rule of Civil Procedure 24.  (Doc. 177).  We granted the motion to intervene on December 29, 2011.  (Doc. 178).  From January 4, 2012 through January 12, 2012 the Court conducted a bench trial for this case.  At the conclusion of trial, the Court ordered that the parties submit post-trial briefs within forty-five (45) days of the filing of the official transcript, and ordered that responsive briefs be filed within thirty (30) days thereafter.  (Doc. 200 at 2).  On motion of the parties, we granted a request to exceed page limitation and increased the page limit to sixty (60) pages.  (Doc. 215).  The Office of Receiver, THA, Dauphin, and CIT each filed a post-trial brief on March 12, 2012.  (Docs. 216, 217, 218, 219).  Responsive briefs were filed by each of the parties on April 11, 2012.  (Docs. 222, 224, 223, 221).  Therefore, having timely received all of the requested submissions, we will proceed to discuss the contested issues pertinent to our analysis and ultimate disposition.

## III.   DISCUSSION

At the outset, we note that as the dispute between the parties presents a

complex series of issues involving mixed questions of law and fact, our analysis of

the questions to be decided will generally follow the chronology of the events and

arguments as presented by THA, CIT, and Dauphin in their post-trial submissions.

### A.    Burden of Proof

As a preliminary matter, we highlight that our analysis is guided by the

burden of proof for this declaratory judgment and permanent injunction action,

which rests with Plaintiffs THA and Dauphin.  *See Fireman's Fund Ins. Co. v.*

*Videfreeze Corp.*, 540 F.2d 1171, 1175 (3d Cir. 1976).  The Third Circuit in

*Fireman's Fund Insurance Company* noted that there are four factors courts

should consider in determining which party bears the burden of proof, they

include: "(1) whether the plaintiff objected to assuming the burden of proof; (2)

which party asserted the affirmative of the issue; (3) which party would lose in the

absence of any evidence on the issue; [and] (4) what sort of relief is sought."  *Id*.

Although the *Fireman's Fund Insurance Company* court noted that the

forum's law would govern a question concerning burden of proof, because such an

issue is substantive as opposed to procedural, we are unaware of any specific

Pennsylvania case law discussing the proper burden of proof in the context of a

declaratory judgment action.  *Id*. at 1175.  Therefore, we shall proceed to analyze

the burden of proof issue under the factors enunciated by the Third Circuit in

*Fireman's Fund*.  Here, we do not find that Plaintiffs have objected to assuming

the burden of proof at any time prior to or during trial.  Moreover, Plaintiffs have

affirmatively raised the declaratory judgment and permanent injunction issues, and

if there was in fact an absence of evidence on the contested issues, Plaintiffs

would lose.  Finally, as previously mentioned, because Plaintiffs seek a

declaratory judgment and permanent injunction we find no reason why the burden

of proof should not reside with Plaintiffs.  *See id*. ("Courts understandably balk at

imposing the burden of proof on unsuspecting defendants after the plaintiff in a

declaratory judgment action has voluntarily assumed the burden of proof and has

given no notice of its claim that the defendant should bear the burden.") (citing

*Liberty Mutual Ins. Co. v. Sweeney*, 216 F.2d 209, 211 (3d Cir. 1954)).

### B.      THA's Authority to Enter into the RSA.

At trial, and in its post-trial submissions, CIT[4] argues that THA possessed

the authority to enter into the RSA, and that nothing in the MAA precluded it from

doing so.  (Doc. 219 at 9).  In fact, the MAA specifically states that municipal

authorities may be created to own and operate entities such as incinerators, and

that "[e]very authority may exercise all powers necessary or convenient for the

---

[4] "CIT" shall refer collectively to itself and Aireal throughout the remainder of the
opinion.

10

carrying out of the purposes set forth in this section." (*Id*. at 9 (citing 53 PA. CONS. STAT. ANN. § 5607 (a), (d))).  Furthermore, it emphasizes that the statute permits municipal authorities to "make and issue . . . other evidences of indebtedness or obligations," (doc. 122 at 9 (citing § 5607(d)(12))), "to execute all instruments necessary or convenient for the carrying on of its business," (doc. 122 at 14 (citing § 5607(d)(13))), "to finance projects," (doc. 122 at 15 (citing § 5607(d)(6))), and "to lease as lessee and use any franchise, property, real, personal or mixed, tangible or intangible, or any interest therein necessary or desirable for carrying out the purposes of the authority, and to sell, lease as lessor, transfer and dispose of any property or interest therein at any time acquired by it." (Doc. 122 at 15 (citing § 5607(d)(4))).  Therefore, CIT maintains, the MAA clearly authorized THA to enter in the RSA.

In addition, CIT cites the testimony of numerous witnesses at trial who testified to the benefit THA received from executing the RSA.  For example, Andrew Giorgione, Esq. ("Giorgione"), Special Counsel to THA, testified as follows:  "**Q:** And it was within the Harrisburg Authority's best interests to see the project continue, correct? **A:** Of course.  **Q:** And continue if possible with the least disruption possible? **A:**  Yes." (Doc. 219 at 9 (citing Doc. 202 162:20-163:1)).  It also notes Giorgione's testimony that there was "enormous pressure" to

finish the incinerator at least by the time the bond payments became due.  (*Id*.

(citing Doc. 202 at 154:21-25)).  Moreover, CIT emphasizes that contractors were

threatening to cease work, and lawsuits were threatened against Barlow and THA.

(*Id*. (citing Doc. 158-3 ¶ 33)).  It highlights the testimony of Dan Lispi ("Lispi"),

Project Manager for THA's Retrofit Project, who stated:

> [d]ebt service was capitalized during construction, so there were no
> payments of debt service until June of 2006, but after that the Authority
> would be liable for paying debt service.  So the debt service required
> that revenues had to be generated, so the plant had to be up and
> operating and making money in order for all that to happen.  So between
> Barlow and the Authority and the Authority's agents, you know, we all
> got together and we wanted to determine well, how much more money
> was . . . going to be required to complete the facility and how were we
> going to be able to get that money.

(*Id*. at 10 (citing Doc. 204 at 217:11-24)).  CIT also cites the testimony of Lucien

Calhoun ("Calhoun"), its expert witness, who testified that "[t]he bondholders

only can benefit if the facility operates."  (*Id*. at 11 (citing Doc. 207 at 32:5-6)).

CIT maintains that the above testimony, and more adduced at trial, illustrates the

belief of the parties involved in the transaction, including THA and the

bondholders, that it was vital for the retrofit of the incinerator to continue.

In opposition, THA contends that the MAA provides, "the powers of each

authority shall be exercised by a board."  (Doc. 217 at 33 (citing 53 PA. CONS.

STAT. ANN. § 5610(a))).  Consequently, it argues there is no legal support for the

12

delegation by a municipal authority of its contract making power to any employee. (*Id.* at 34 (*Sampson Bros., Inc. v. Monroeville Water Auth.*, 112 Pitts. L.J. 203, 206 (Allegheny County 1964))). Moreover, it cites 65 PA. CONS. STAT. ANN. § 704 for the proposition that the legislature requires "official action" on a matter of "agency business" to be raised at an open, public meeting in accordance with the Sunshine Law. (*Id.* at 34 (citing *Waymart Water Co. v. Waymart*, 4 Pa. Super. 211 (1897) (holding that a borough council "must exercise its powers by joint action as a board. Loose discussions without any motion or united action are not sufficient.") (internal citations omitted))).

Here, we agree with CIT that neither *Sampson Brothers, Incorporated* nor *Waymart Water Company* stand for the proposition that a board can not delegate such contractual authority to its officers. Regarding *Sampson Brothers, Incorporated*, this case presented the question of whether "the oral agreement plaintiffs aver represent[s] a valid exercise of the Authority's contract-making power?" *Sampson Bros. Inc.*, 112 Pitts. L.J. at 205. There, the court ruled that an oral agreement between the plaintiff contractor and a municipal employee was not enforceable because to allow such a contract to stand "without competitive bidding simply does violence to the whole rationale and public policy underlying the requirements and safeguards which have been erected to regulate the execution

of public contracts." *Id*. at 208.  We find THA's reliance on this case to be

misplaced because the court's invalidation of the contract centered primarily upon

the insufficiency of a single municipal employee's authority to bind the entity

through an oral agreement.  In contrast, here we are confronted with not only one

municipal representative, but numerous THA officials, including the board

chairman, executive director, and solicitor who were explicitly authorized to

transact business on behalf of THA in order to close a deal on the incinerator.

Moreover, the express intent of such officials to bind THA to the RSA was

memorialized through numerous written documents.

As to THA's reliance on *Waymart Water Company*, we agree with CIT that

while this case did involve a claim that a local municipality exceeded its authority

regarding the purchase of six fire hydrants, it was the defendant in that case who

raised this argument in opposition to the plaintiff's contention that the agreement

encompassed more than merely the sale of six hydrants, but also included an

agreement to purchase water for a term of ten years and to pay a corresponding

rent per hydrant for the supply of water.  4 Pa. Super. 211, 217-19 (Pa. Super. Ct.

1897).  As it was the plaintiff who sought to prove that the burgess acted within

the authority granted him by virtue of the borough council's resolution, the court

held that "[i]t was incumbent on the plaintiff to prove the assent of the borough

14

council to the contract executed by the burgess; for without that the borough

would not be bound although the paper was executed with all due formality."

*Waymart Water Company*, 4 Pa. Super. at 218.  Notably, the *Waymart* court found

that the plaintiff's two witnesses, who testified that they only recalled discussing

the purchase of the hydrants at the borough council meeting, failed to sustain the

plaintiff's burden through parol evidence that the agreement was in fact broader

than the authorizing resolution.  *Id*.

We find this case to be distinguishable from the instant matter because in

the case *sub judice*, THA executed numerous documents evidencing its firm intent

to be bound to the transaction, documents that it now strenuously seeks to

disembowel.  For example, THA voluntarily entered into the RSA through the

2005 Resolution and executed the RSA and Consent to Assignment, both of which

expressly represented its intent to enter into the RSA.  (Doc. 204 at 150:6-13

(Mealy testifying:  "**Q:** Were you aware of any misstatement by CIT that resulted

in the Harrisburg Authority signing this agreement?  **A:**  No.")).

For example, the Resolution approved at THA's December 21, 2005

meeting specifically provides that "[t]he Authority approves and authorizes entry

into a First Amended and Restated NonExclusive Technology Sub-Licensing

Agreement and Consent to Assignment thereof in substantially the form attached

hereto, *or as may be further amended and restated by the consent of the Authority Chairman, Executive Director and Solicitor*." (J.E. 12 ¶ 4) (emphasis added). Therefore, we find any argument by THA that its officials lacked the proper authority to enter into the RSA to be disingenuous given that the Resolution was appropriately adopted on December 21, 2005 "by the board of The Harrisburg Authority in lawful session. . . ." (*Id.*).

We also find the Commonwealth Court's decision in *Beaver Dam Outdoors Club v. Hazleton City Authority* to be instructive. 944 A.2d 97 (Pa. Commw. Ct. 2008). In that case, one of the questions that confronted the court was whether a prior board of the authority performed an ultra vires act by approving and executing a lease. *Id.* at 107. The court emphasized that "[g]enerally, authorities are established for the purpose of financing and managing revenue producing projects of a public nature or other activities that are not considered to be part of core governmental activities; they are a government business venture, a form of quasi-privatization." *Id.* at 110 (citing *Boyle v. Mun. Auth. Of Westmoreland Cnty.*, 796 A.2d 389, 393 (Pa. Commw. Ct. 2002)).

In discussing whether a municipal authority can enter into a long-term contract, binding upon its successors, the court held that "[i]f the contract relates to a governmental function, it cannot bind successors; however, if the contract

16

relates to a proprietary function, it can bind successors." *Id*. at 111.  Furthermore,

the court listed three factors to consider in evaluating whether activity is

governmental or proprietary, and noted that an affirmative answer to any of the

inquiries renders the function proprietary: "(1) the activity is one that government

is not statutorily required to perform; (2) the activity also may be carried on by

private enterprise; or (3) the activity is used as a means of raising revenue." *Id*. at

111.  Under the first factor, the local government is not required to provide

incinerator services to the public.  As to the second factor, the operation of the

incinerator could be carried on by a private enterprise.  Concerning the third

factor, after the payment of its debt obligations, the incinerator would presumably

be used a means of raising revenue.  *See also Program Admin. Servs. v. Dauphin*

*Cnty. Gen. Auth.*, 874 A.2d 722, 726-29 (Pa. Commw. Ct. 2005) (concluding that

53 PA. CONS. STAT. ANN. § 5607(d)(12) conferred upon an authority the power to

lend money to school districts for financing and that such an act was proprietary in

nature and therefore bound successor boards because it was an activity not

required by statute, it is one that is carried on by private lenders, and it was

designed to raise revenue for the authority).  Therefore, based on the affirmative

answers to each of the preceding factors, we find that THA engaged in proprietary

acts in negotiating and executing the 2005 Resolution and the RSA, and as such its

17

officials were properly authorized to bind THA to the subject transactions.

### C.       The City of Harrisburg's Consent.

In its post-trial submission, as at trial, THA contends that the City Consent was not submitted to, or approved by, City Council as required by Pennsylvania law.  Citing *Vartan v. Reed*, it claims that the Mayor may only execute agreements that have been approved by City Council.  (Doc. 217 at 31 (citing 677 A.2d 357, 361 (Pa. Commw. Ct. 1996))).  THA also points to the Pennsylvania Commonwealth Court's decision in *Capital City Lodge No. 12 v. Pennsylvania Labor Relations Board* where the court held that "the Mayor [Mayor Reed] had no authority to negotiate contracts imposing financial burdens and obligations on the City without approval of the City Council."  (*Id.* (citing 30 A.3d 1241, 1244-45 (Pa. Commw. Ct. 2011))).  It further claims that because CIT was the party asserting the validity of the documents comprising this transaction, that it had the burden of proof regarding the existence of a valid Consent from the City.  (*Id.* at 32).

THA maintains that the "Form of Consent and Agreement" attached to the December 21 resolution provided consent to a completely different transaction. (*See* J.E. 12).  Thus, it asserts that the "consent" document presented to the THA board on December 21, and the document signed on January 11, are not the same

18

document.  (Doc. 217 at 35).  In particular, it argues that on December 27, 2005, the structure of the RSA changed dramatically eliminating references to "collateral" and remedies for THA and instead substituting the following in its place: (1) the hell or high water provision; (2) the deletion of any rights or defenses of THA; (3) a provision regarding operating expenses; and (4) allegedly oppressive remedies in favor of CIT.  (*Id*. at 35-36).  THA further claims that the Forbearance Agreement failed to cure the inherent issues surrounding approval of the RSA because it was approved by THA on June 27, 2007, more than seventeen (17) months after the RSA was signed.  (*Id*. at 37).  In addition, it emphasizes that the RSA referenced in the Forbearance Agreement was never attached to it.

On the other hand, CIT highlights the testimony of Dan Miller, Controller for the City of Harrisburg, who testified as follows:

> **Q:**  If I understand the import of your testimony, Mr. Miller, it's simply that because these documents are not an expenditure from your perspective, there was no need for the controller to sign them, correct?
> **A:**  Correct.
> **Q:**  So the controller's signature was essentially superfluous correct?
> **A:**  I believe the controller could not sign them because he wasn't authorized, they weren't authorized by city council, and really they're not just related to expenditures either.
> **Q:**  Well, then his signature is just superfluous, right?
> **A:**  That could be, yes.

(Doc. 219 at 48 (citing Doc. 206 at 94:25-95:14)).  It also maintains that based on

the testimony of Bruce Foreman ("Foreman"), THA's Solicitor from

approximately 2003 until after the instant litigation was filed, the City's consent

was irrelevant.  (*Id*. (citing Doc. 205 at 206:12-208:3 (**Q:** Do you have a legal

view as to what the city's role is when the Authority transacts this type of

business, that's the Harrisburg Authority?  **A:** No, I don't think the Authority, I

don't think the city would have to, would have to consent to the Authority taking

this action.  **Q:** You don't believe that the city has a role in that?  **A:**  No. . . **Q:** So

your view is that the Authority could act absent any consent or any imprimatur put

on the transaction by the city of Harrisburg, your view as a solicitor or as the

general counsel for the –  **A:**  Outside of a contractual, outside some obligation we

had under a bond or some other contract with them, but as a general matter

yes."))).  All of this, it claims, renders unavailing THA's argument that the

invalidity of the consent of the City of Harrisburg nullifies the RSA.

Concerning THA's consent, CIT points to Resolution No. 2005-019,

executed by THA at its December 21, 2005 meeting, which provides "[t]he

Authority approves and authorizes entry into a First Amended and Restated

NonExclusive Technology Sub-Licensing Agreement and Consent to Assignment

thereof in substantially the form attached hereto, or as may be further amended and

restated by the consent of the Authority Chairman, Executive Director and

20

Solicitor."  (Doc. 219 at 12 (citing Joint Exhibit ("J.E.") 12 at THA09208[5])).  As a result, CIT maintains that the 2005 Resolution explicitly authorized entry into the RSA through the actions of THA's Chariman, Executive Director, and Solicitor.

While THA argues that the Resolution approved by it on December 21, 2005, and the one signed on January 11, 2006, bear little resemblance to one another, as CIT notes, THA failed to explain what the differences were, if any, between the 2005 Resolution and the final version of the Consent to Assignment. Moreover, Giorgione testified as follows: "**Q:** And by this authorization, by this resolution the board of the Harrisburg Authority permitted the Authority chairman, executive director, and solicitor to further amend and restate the sub-licensing agreement, correct?  **A:** It appears, yes."  (Doc. 202 at 174:22-175:2).  CIT also highlights Thomas Mealy's testimony, THA's Executive Director at the time, who stated that the 2005 Resolution authorized THA's chairman, executive director, and solicitor to amend and restate the RSA, regardless of whether the changes are material or not.  (Doc. 219 at 12-13 (citing Doc. 204 at 146:25-147:16 (**Q:** And indeed as you can see from this language in the Harrisburg Authority resolution, if the consent of the Authority chairman, the executive director, and solicitor had

---

[5]  For documents that contain complete pagination for the exhibit as a whole, we shall cite to the original pagination therein if appropriate.  For exhibits that do not contain original pagination, the Court shall instead cite to the Bates Stamp pagination as reflected thereon.

been obtained, there was no need to go back to the Harrisburg Authority board to get approval, correct?  **A:** Correct.")))  In accordance with the 2005 Resolution, CIT highlights that THA's Chairman John Keller signed the RSA, (J.E. 38 at THA06625), the solicitor signed a written opinion regarding the RSA, (Defendant's Exhibit ("D.E.") 30 at 3), and that Executive Director Mealy, the chairman, and solicitor all met in the Mayor's Office on January 9, 2006 at which time Giorgione conveyed the details of the transaction to those present.  (Doc. 219 at 13).  Moreover, Mealy testified as follows:

> **Q:** And the signing of this [the RSA] by the chairman, was that done with the knowledge and consent of Mr. Foreman, the solicitor?
> **A:** Yes.
> **Q:** And the signing of this by Mr. Keller, the chairman, it was done by, was done with the consent also of you, correct, Mr. Mealy? . . .
> **A:** Yes, but I would have to say that I was relying on the solicitor.
> **Q:** That's fine.  Nonetheless, you gave the consent, didn't you?
> **A:** Uh-huh.
> **Q:** Yes?
> **A:** Yes.

(Doc. 204 at 148:14-149:8).

CIT also emphasizes that when Giorgione was asked what he understood the language "ratified and confirmed" to mean in the Forbearance Agreement, he testified "[t]hat the sublicensing agreement was, you know, a valid document and the Authority was bound by it."  (Doc. 219 at 17 (citing Doc. 203 at 104:8-12)).  It

claims that despite THA's argument that ratification of the RSA is ineffective because it occurred seventeen (17) months after the agreement was executed, THA failed to provide any legal authority for this assertion.  CIT cites Foreman's testimony where he testified as follows: "**Q:** And, sir, with regard to the advisability of waiting seventeen months before ratification, doesn't that really depend on the circumstances and the reason why a ratification is requested at any one point in time?  **A:** Correct."  (Doc. 219 at 17-18 (citing Doc. 205 at 194:1-6)).

Significantly, Giorgione represented to CIT that THA's resolutions and amendments were completed as "provided to you prior to the holiday."  (J.E. 12 at MVA003159A).  Additionally, Keith Mrochek, counsel to CIT, testified that "[o]ur understanding was that the resolutions done by the Authority that were delivered to us in, I think they were described as Joint Exhibit Number 12, were sufficient to authorize this transaction on behalf of the Authority."  (Doc. 207 at 98:15-19).  CIT also maintains that THA ratified the RSA through its conduct.  It cites the Pennsylvania Commonwealth Court's decision in *Pittsburgh Baseball, Incorporated v. Stadium Authority of the City of Pittsburgh*, for the proposition that "municipal inaction *plus* the acceptance of benefits under the contract may constitute ratification."  (Doc. 219 at 19 (citing 630 A.2d 505, 509 (Pa. Commw. Ct. 2009))).  CIT notes that THA's initiation of forbearance discussions with CIT

23

is evidence of THA's belief that the payment of license fees under the RSA was a valid obligation on its behalf.  (*Id*. at 19-20).  Thus, it maintains that THA's inaction for two full years after CIT expended $25 million on the incinerator constitutes ratification of its obligations under the RSA and acts to cure any defects in authorization that may have existed.

Additionally, CIT claims that THA is estopped from disavowing the validity of the RSA.  Relying on *Albright v. City of Shamokin* for the proposition that "[a] municipality like a private corporation is subject to the doctrine of estoppel" and "may be estopped to deny the authority of its agents and employees to act if it has the power to act," CIT argues that allowing THA to renege on its representations after it received the benefit of $25 million would be unconscionable.  (*Id*. at 20-21 (citing 419 A.2d 1176, 1178 (Pa. Super. Ct. 1980) (holding that the city was estopped from denying retirement benefits, even though the retirement plan did not conform to the Third Class City Code, because "[i]t would be a cruel hoax to permit the municipality, after appellee had retired from his employment upon the promise of the City to pay him benefits of $100 per month, to withdraw its promise."))).  As to the representations THA made in this case, Mrochek testified to the following at trial:

**Q:** Do you know if CIT relied upon the representations in the [RSA] in

agreeing to provide the 25 million dollars for the retrofit project?
**A:** I know that they could not have gotten the project approved or the deal approved without those representations and warranties.
**Q:** And are you saying CIT couldn't get the deal approved by its own credit committee without those representations and warranties?
**A:** That's correct.  At least that was our understanding.

(*Id*. at 21 (citing Doc. 207 at 94:18-95:4)).

Here, we find it significant that section 8(b)(i) of the RSA explicitly

provides:

> [t]he Authority is authorized to enter into this Agreement; this Agreement does not conflict with any applicable law, contract, lease, instrument or other obligation to which it is a party or by which it is bound; and this Agreement represents a valid and binding obligation of the Authority, enforceable according to its terms.

(J.E. 38 at 6).  Furthermore, the last clause in section 8 states "[p]rior to execution

of this Agreement, the Authority shall provide to Licensor/Seller an opinion of

counsel satisfactory to Licensor/Seller addressing the representations contained in

Sections 6(d) and 8(b)(i) above and such other matters reasonably requested by

Licensor/Seller."  (*Id*.).

Additionally, we find THA's reliance on *Vartan v. Reed* to be unavailing,

because although the Pennsylvania Commonwealth Court held that the Mayor

could only enter into agreements that had been approved by City Council, the

agreement purportedly contained a provision stating that "the City agreed that

25

Vartan's plan had been deemed approved; that Council would agree to sign any final plan, . . .." *Vartan*, 677 A2d at 360.  Thus, in that case there was apparently a belief that City Council approval was necessary for the action, and as a result an express representation was made in the settlement documents suggesting that City Council would sign the final plan.  *Id*.  In contrast here, there was no representation from THA that City Council approval was necessary, or even contemplated, in entering into the RSA.  In fact, THA's officials went to great lengths to assure CIT that it in fact had the authority to restate the original SLA. Moreover, given the language of the Resolution executed on December 21, 2005, there was apparently no belief on the part of THA that it was required to involve City Council in this transaction because it was already vested with the authority to transaction business pertaining to the incinerator.  (J.E. 38 at 6).

We also find THA's citation to *Capital City Lodge No. 12 v. Pennsylvania Labor Relations Board* to be distinguishable from the case *sub judice*.  In *Capital City Lodge*, the Commonwealth Court invalidated an employment contract extension agreement entered into between former Harrisburg City Mayor Stephen Reed and the Fraternal Order of Police.  *Capital City Lodge No. 12*, 30 A.3d at 1245.  Specifically, the court noted that Section 413(c) of the Optional Third Class City Charter stated that "[a]ll bonds, notes, contracts and written obligations of the

city shall be *executed* on its behalf by the mayor and the controller," and that "execute" means to "discharge the ministerial duties relating to a contract." *Id*. at 1244.  Furthermore, the court highlighted that in *Moore v. Reed*, the Commonwealth Court held that "the Mayor had no authority to negotiate contracts imposing financial burdens and obligations on the City without approval of City Council," and that "[t]he authority to negotiate a valid and binding contract for a municipality is vested in the City Council.  It is a legislative function.  Without the assent of City Council, the municipality is not bound."  *Id*. at 1244-45 (citing 559 A.2d 602, 603 (Pa. Commw. Ct. 1989)).

We find this case distinct from the instant matter because here, the authority of the Mayor to enter into a transaction is not at issue, as was the case in *Capital City Lodge*.  Rather, in this case the issue is whether the authority delegated to THA to enter into a binding and enforceable contract was proper.  Again, we reiterate that the MAA permits municipal authorities to be created for the purpose of owning and operating entities such as incinerators, *see* 53 PA. CONS. STAT. § 5607(a)(9), (d), and that such authorities are vested with the power "to lease as lessee and use any franchise, property, real, personal, or mixed, tangible or intangible, or any interest therein necessary or desirable for carrying out the purposes of the authority, and to sell, lease as lessor, transfer and dispose of any

27

property or interest therein at any time acquired by it, *see* § 5607(d)(4), to "make and issue . . . other evidences of indebtedness or obligations, *see* § 5607(d)(12), and to "make contracts of every name and nature and to execute all instruments necessary or convenient for the carrying on of its business, *see* § 5607(d)(13). Therefore, we find that the MAA conferred the same broad authority upon THA, which authorized its entry into the RSA and the subsequent agreements and amendments thereto, that it now seeks to minimize by requesting a declaration from this Court that it exceeded its own statutorily delegated authority.

We also find THA's arguments that the nature and substance of the transaction changed dramatically between December 21, 2005 and January 11, 2006, to be an insufficient grounds to invalidate the agreement.  While portions of the agreement may have been altered to provide CIT with the assurances it needed to complete the transaction, we find THA's position to essentially suggest that it was powerless to stop and reconsider whether entering into the RSA was in its, and the City's, best interests.  This argument is as unconvincing as THA's contention that the Forbearance Agreement, which was executed seventeen months later, was insufficient to ratify the RSA.  Again, THA seeks a remedy from this Court that would save it from the very monster it created, when in reality it entered into the RSA with "eyes wide open" and actually performed under the

agreement from January of 2006 until June of 2007 when THA itself initiated

forbearance agreement discussions.  Throughout this litigation, the Court has

pondered, why, if the RSA was so patently objectionable to THA from the time

they allege that the structure changed dramatically, did no one from THA or

Dauphin take a step back and reevaluate their approval of these agreements.  The

only possible explanation, and the one clearest to the Court after hearing all the

testimony, is that THA knew precisely what it was doing.  It was only after the

house of cards came crashing down that it needed to back-peddle and in turn seek

to void the very transaction it had worked for months to create in attempting to

ensure a continued stream of financing for a project that was already long overdue.

This belief is further confirmed by the testimony of Giorgione to wit;

> **A:** . . . Indications from our underwriter was there was no market to sell
> any bonds if the city or the Authority, maybe even in partnership with
> the county, even wanted to issue debt to try to finish the project.  I think
> that was their opinion that given the status of the project being in limbo,
> not being complete, out of money, that they didn't feel there was a
> marketplace to sell bonds to complete the project anyway.  So we never
> really thought of going the route of some sort of traditional financing to
> raise funds to complete the project, because based on what we were
> being told there just wasn't a marketplace for it.
> **Q:** Okay, but in term[s] of participation in this transaction there was a
> request for city involvement, isn't that accurate?
> **A:** As part of the documents signed at closing, yes, the mayor and the
> controller signed documents for purpose[s] of the CIT transaction.

(Doc. 202 at 129:11-130:5).  Moreover, in response to questioning from the Court,

Foreman testified:

> **Q:** So your view is that the Authority could act absent any consent or any imprimatur put on the transaction by the city of Harrisburg, your view as a solicitor or as the general counsel for the –
> **A:** Outside of a contractual, outside some obligation we had under a bond or some other contract with them, but as a general matter yes.

(Doc. 205 at 207:20- 208:3).

Finally, we find any contention by THA that CIT had an obligation to circumvent THA's contractual relationship with its own bondholders in order to obtain their approval for a transaction to which the bondholders were not even a party, to be patently ridiculous.  During his testimony, Mrochek testified on this very subject as follows:

> **Q:** This is Joint Exhibit 19.  That's an e-mail from you, Mr. Mrochek, to Mr. Giorgione and copied to several others.  In there it says, "obtaining as much comfort as possible concerning the operating expense issue both in the form of consents from the Authority, the city, and if possible, the bond insurer, and in the form of a subordination from the city with respect to reimbursement payments."  Do you see that?
> **A:** I do.
> **Q:** And you're stating that to Mr. Giorgione on the 28th of December [2005].  Is that a request that came from your client?
> **A:** I assume so.
> **Q:** Would there have been anything to prohibit anyone at MVA, or CIT for that matter, from going directly to FSA for a consent instead of going through Mr. Giorgione?
> **A:** Practically speaking we could have picked up the phone or have written an e-mail to them, but we don't want to interfere with parties' relationships with their bondholders.  And no, we never would have done that.  Not without the Authority's consent.

**Q:** Well, if your goal here was to be as sure as possible that this was an operating expense, isn't that a, wouldn't that have been a smart move? **A:** *No. Interfering with somebody's third party relation is not a smart move without their consent.*

(Doc. 207 at 111:5-112:11) (emphasis added).

Accordingly, we find any assertion that CIT had a duty to contact the bondholders, with whom it had no relationship and was not contracting with under the RSA, to lack merit and ultimately constitute a misstatement of CIT's duty under the circumstances.

### D.     The Substance of the Transaction and Ultra Vires Conduct.

THA has also maintained throughout this litigation that the Court should look past the label affixed to the transaction by the parties, and recognize its true substance.  (Doc. 217 at 39).  It claims that CIT originally intended to loan Barlow $25 million through its subsidiary Newcourt Capital, and that Barlow would make payments on the loan with revenues from a management contract and a revised sublicensing agreement.  (*Id*. at 39-40).  Based on Barlow's nearly bankrupt financial condition, THA claims that CIT needed the equivalent of "debtor-in-possession" financing to ensure it received priority in repayment.  To provide this, THA claims, CIT enlisted its assistance to act as the repaying party, but CIT again needed a guarantee that it would be paid ahead of THA's many creditors.  (*Id*. at

31

40).  While CIT first considered a management agreement as the asset that would

be worth $25 million, it eventually settled on a technology sublicense.  (*Id*.).

THA asserts that a licensing fee of $25 million is an exorbitant sum for

technology of this size, and that CIT did not conduct an inquiry into whether such

a fee was reasonable under the circumstances.  (*Id*. at 41).  Instead, it maintains

that CIT created a company that Barlow would own for a short time, Aireal, to

which Barlow assigned the RSA and the attendant right to receive licensing fee

payments.  Subsequently, CIT bought Aireal from Barlow for $25 million, and

thus obtained the right to receive repayment of the $25 million in licensing fees,

which was ultimately payable by THA.  (*Id*.).  Furthermore, THA contends that it

was absurd for it to pay CIT come "hell or high water" for the technology when it

had already paid for the technology in full.  (*Id*. at 42).  In particular, THA claims

that it exchanged a guaranteed maximum payment increase on the equipment

agreement for a $2.7 million lump sum payment in satisfaction of its obligations

under the original SLA.  (*Id*.).  Thus, it maintains that once the obligations under

the original SLA were extinguished, THA had the continued use of the technology

for free.  THA contends that to return Barlow to the position of obligor under the

RSA, Barlow and THA executed Amendment 9 to the Equipment Agreement,

through which Barlow would forward to THA whatever THA owed under the

32

RSA.  (*Id*.).  Additionally, it argues that while CIT was not a party to the transaction, it was aware of it nonetheless.  (*Id*. at 42-43).  THA emphasizes that the purpose of Amendment 9 was to maintain the character of the licensing fees paid by THA as "operating expenses."  It also argues that because numerous individuals testified at trial that the true nature of the transaction was a debt and a guarantee, that the Court should intervene and recast the agreement as what it actually was.  (*Id*. at 43).  THA suggests that CIT constructed this complex series of transactions in order to position itself so that it could provide a larger "bridge loan," or takeout financing, to Barlow for a long-term lease or purchase of the incinerator.  (*Id*. at 44).

Finally, THA claims that the Local Government Unit Debt Act (the "Debt Act") gives "local government units" the ability to guarantee debt.  (*Id*. at 46 (citing 53 PA. CONS. STAT. § 8005)).  However, it highlights that the statute specifically excludes municipal authorities from the definition of "local government unit."  (*Id*. (citing 53 PA. CONS. STAT. § 8002(c))).  Therefore, THA claims that since it is clearly a municipal authority, it inherently lacks the authority to guarantee debt as it did in this transaction.

Again, the Court is unmoved by THA's attempt, years later, to invalidate the RSA when it was fully aware of the agreement it was entering into at the time.

Regardless of whether CIT required the equivalent of debtor-in-possession financing, the fact remains that the transaction was structured as an asset sale of Aireal from Barlow to CIT.  Moreover, Amendment 9 expressly states that "the Amended Agreement is hereby ratified and confirmed and shall continue in full force and effect."  (J.E. 40 at THA06611).  Also, the December 21, 2005 Resolution explicitly provided, "[t]he Authority approves and authorizes entry into a First Amended and Restated NonExclusive Technology Sub-Licensing Agreement and Consent to Assignment thereof in substantially the form attached hereto, *or as may be further amended and restated by the consent of the Authority Chairman, Executive Director and Solicitor*."  (J.E. 12 ¶ 4) (emphasis added).  Finally, we note that at trial it became abundantly clear that while THA cast CIT as merely a greedy lender hoping to obtain the greater financing that would come from a sale of the incinerator, it was not as if a sale of the incinerator was not contemplated by THA, and in fact, Giorgione acknowledged that THA stood to gain substantially from a sale of the facility.  (Doc. 202 at 50:12-51-9, 54:11-15).[6]

---

[6] Giorgione testified as follows:

**Q:** Okay, and in this document you're reporting to them as of November 29th, 2005, you're reporting, "Dan and I are going to Barlow to meet a lender in NYC this Thursday.  This is the lender who has given preliminary approval for the purchase of the facility by Barlow.  We expect we may be asked to guarantee the loan to Barlow or pledge surplus revenues towards repayment." so on and so forth, to the end of that highlighting.  In terms of the first reference with regards to the lender that had given preliminary approval for the purchase of the facility,

In addition, we find that the additional language at the end of paragraph fifteen (15) in the RSA, which states, "[t]he parties hereto acknowledge and agree to the extent this Sub-License is assigned pursuant to a Permitted Assignment, the applicable Permitted Assignee and any third party purchase of the equity interests of such permitted assignee shall not be considered an Associated Barlow Entity for purposes of the Equipment Agreement," was known and understood by the parties to this transaction.  (*See* J.E. 38 ¶ 15).  To include Aireal as an "Associated Barlow Entity" would result in CIT paying license fees to itself pursuant to Amendment 9. (J.E. 40 ¶ 5).  Significantly, Mrochek testified as to the following concerning Amendment 9:

> **Q:** Is that an agreement [Amendment 9] that CIT was not going to be a party to?

---

what was the basis for that statement?  Had you seen anything or anything in writing [ ] where you had been notified that there had been preliminary approval of the sale of the facility to Barlow?
   **A:** I would assume, but I don't recall specifically.
   **Q:** Okay.  As of November 29th was, were there, were you close in the negotiations to negotiating the sale of the incinerator?
   **A:** I recall there was a term sheet in place I believe by this time or close to this time for a sale of the facility.

(Doc. 202 at 50:12-51:9).

   **Q:**   You were talking about a sale of the incinerator, January 18, 2006.  Is it accurate to say that drafts were being circulated pertaining to the sale of the incinerator?
   **A:** Yes.

(*Id*. at 54:11-15).

**A:** CIT wasn't a party to it, and again we had never seen it before January 10th. But to a large degree we considered this arrangement between Barlow and the Authority superfluous to us. It had nothing to do with CIT's part of this deal.

**Q:** But your only concern was whether or not the CIT owned entity would be considered an associated Barlow entity, which is a term that appears in Amendment Number 9?

**A:** That's correct.

**Q:** And so what did you do, if anything, to address those concerns?

**A:** We had everyone stipulate to the addition of a one or two sentence provision into the sub-license that stated expressly that the new entity that would be owned by CIT would not be considered an associated Barlow entity for purposes of this amendment.

\*          \*          \*          \*          \*          \*

**Q:** Was it ever the intent of the parties of the discussions that you had up until that point that CIT be bound by Amendment Number 9?

**A:** No. I mean, it would have created the absurdity of us paying for it ourselves.

**Q:** . . . And how did you deal with ensuring that this additional language be added to the restated sub-licensing agreement?

**A:** We got all the parties to stipulate that it was okay to slip sheet that additional language into the existing draft of the sub-license.

**Q:** And if you turn to the second page of Joint Exhibit 34, it's an e-mail chain, and at the top it's an e-mail from you dated January 12th, around noon, and it says, you're writing, "No reason for him to have it re-executed. We just need his blessing to slip sheet it. We haven't changed the version number. Do you see that?"

**A:** I do.

**Q:** Is there a reason why you didn't change the version number?

**A:** It would have created the unnecessary time and hassle of having everybody re-execute a document that we all agreed to the terms of.

**Q:** Is there any issue as to not making it a new version number.

**A:** It was a matter of expediency.

**Q:** So that all the signature pages had the same version number on it?

**A:** Well, ultimately, yeah, if we had changed the version number we would have needed everybody to re-execute the document en masse when we had the understanding that everybody had agreed to the

change, there was no reason to – if we changed every document, or if we
changed versions on every document we made one or two changes to,
we'd end up with hundreds of versions of some documents I knew, and
we just don't do that.

**Q:** And if there – was there any pressure to get this deal closed?

**A:** Our understanding was that the, both Barlow and the Authority felt
that the deal had to be closed as soon as possible in order to get the
project up and running as fast as possible, and we were doing all we
could to accommodate their needs.

**Q:** Pull up Exhibit 35, and ultimately the Harrisburg Authority had to
agree as to whether or not this language would be added to the
document, is that correct?

**A:** They did.

**Q:** Is your recollection that the Harrisburg Authority did agree?

**A:** Our – well, my recollection is that we were told by Andy Giorgione
via these emails you see here that yes, the Authority would agree to the
language and acknowledge that there was no reason to create another
version of the document, we could simply slip sheet it, and that he had
gotten the authority, or the executive director of the Authority to
approve the insertion.

(Doc. 207 at 87:19-88:14; 89:10-91:23). Significantly, Giorgione's email

response to Mrochek stated "I just confered [sic] with the Executive Director of

the Authority and he *approves the change and manner of insertion*." (J.E. 35)

(emphasis added).

Furthermore, even if THA did not properly authorize the 2005 Resolution,

its participation in the 2007 Resolution ratified THA's entry into the RSA and

cured any deficiencies that previously existed. (*Id*. at 20). As CIT noted, the

Commonwealth Court in *Eckert v. Pierotti* stated that ratification "may be made by

37

the affirmative action of the proper officials, or by any action or nonaction which in the circumstances amounts to an approval of the contract." 553 A.2d 114, 118 (Pa. Commw. Ct. 1989); *see also Chainey v. Street*, 523 F.3d 200 (3d Cir. 2008). Here, we find that THA's execution of the 2007 Resolution affirmatively ratified the RSA, in addition to its conduct which was also tantamount to acceptance of the benefits flowing from the RSA.

### E.    Consideration

THA also argued at trial that CIT's capital infusion of $25 million to Barlow provided THA with nothing.  (*Id*. at 51).  It cites *Chatham Communications, Incorporated v. General Press Corporation* for the proposition that performance of an act one is legally bound to render does not constitute legal consideration because a party receives nothing in return for its promise beyond that which it was already entitled to receive.  (*Id*. (citing 344 A.2d 837, 840 (Pa. 1975))).  THA reiterates that the evidence produced at trial demonstrates that with the exception of retainage held pending completion of the project, THA had already paid Barlow the full guaranteed maximum price for the retrofit of the incinerator.  (*Id*.).

Additionally, THA asserts that despite CIT's contention that it received adequate consideration for the project, namely potential ownership of the

38

technology and the ability to use the technology at additional burners, such alleged benefits fail to constitute adequate consideration.  For example, it claims that the RSA still imposed restrictions on its use of the "owned technology" to such an extent that its rights to use the technology under the RSA essentially mirrored its rights under the original SLA, which it contends it paid for in full.  (*Id*. at 52). Next, THA argues that paying an additional $25 million for the potential use of technology at other burners is absurd because there is no evidence that a fourth burner was ever considered.

In opposition, CIT highlights that under Pennsylvania's Uniform Written Obligations Act ("UWOA"), a statement in a contract expressing that the parties intend to be legally bound is sufficient consideration.  (Doc. 219 at 22 (citing 33 PA. CONS. STAT. ANN. § 6 ("[a] written release or promise, hereafter made and signed by the person releasing or promising, shall not be invalid or unenforceable for lack of consideration, if the writing also contains an additional express statement, in any form of language, that the signer intends to be legally bound."))). It also cites to an Eastern District of Pennsylvania case where the court recognized that "an additional express statement of the intent of the parties to be bound are enforceable whether or not consideration exists for the agreement."  (*Id*. at 22-23 (citing *Interdigital Commc'ns, Corp. v. Fed. Ins. Co.*, 392 F. Supp. 2d 707, 712

(E.D. Pa. 2005))). Thus, CIT maintains that since the RSA contained an express statement that the parties intended to be bound, the RSA is in full compliance with the UWOA and does not fail for lack of consideration. (*Id*. at 23 (citing J.E. 38)). Furthermore, it highlights Giorgione's testimony where he stated that he was familiar with language, such as that contained in the "NOW, THEREFORE" clause[7] on the first page of the RSA, and its effect as a general substitute for consideration. (*Id*. (citing Doc. 203 at 67:1-68:14)).

CIT further contends that there is no evidence that Amendment Number 4 eliminated the payment of license fees to such an extent that the RSA lacked consideration. (*Id*.). Notably, it points to Giorgione's testimony where he stated the following: "**Q:** . . . where in this document [Amendment No. 4 to the RSA] says that as a result of this amendment there is no further obligation to pay licensing fees? . . . **A:** The answer is no." (Doc. 219 at 24 (citing Doc. 202 at 160:6-161:5)). It also cites Mrochek's testimony where he stated as follows: "**Q:** And did Andy Girogione or anyone else from the Harrisburg Authority ever say to you that the Harrisburg Authority had paid all of the fees under the 2003 original sub-licensing agreement? **A:** No. And even had they done so it doesn't I guess to

---

[7] The clause states in full: "NOW, THEREFORE, in consideration of the mutual premises set forth herein, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties hereby agree to amend and restate the Replaced Agreement in its entirety as follows . . . ." (J.E. 38 at THA06614).

40

some degree prevent the reestablishing [of] a set of fees if there are any other

obligations involved in the document." (*Id*. at 24-25 (citing Doc. 207 at 131:20-

132:3)).

In addition, CIT emphasizes that the original SLA remained in effect

because THA needed the right to use the technology.  (*Id*. at 25 (citing J.E. 3 at 4

("the Licensing Agreement shall continue in full force and effect"))).  It also

highlights Mrochek's testimony to extent he stated the following:

> **Q:** . . . What do you understand Amendment Number 4 to do?
> **A:** My understanding of what Amendment Number 4 was intended to do
> was eliminate some portion of the payment due under the existing
> licensing agreement.
> **Q:** Did you –
> **A:** In an amount equal to 2.7 million dollars, although exactly which
> payments and in what order and priority was never made clear to us.
> **Q:** Did you understand it to eliminate all payments that the Harrisburg
> Authority were to owe under the 2003 original agreement.
> **A:** That wasn't our understanding.
> **Q:** Was the original sub-licensing agreement still in effect as of even
> after Amended Number 4 had been executed?
> **A:** Yes.  By the terms of the amendment.
>                *            *            *            *            *
> **Q:** Just turning back to the issue of Amendment Number 4 for a second,
> at the time that you reviewed Amendment Number 4 did you have any
> evidence that the Harrisburg Authority had already purchased the sub-
> license?
> **A:** We did not.
> **Q:** And even after your review of Amendment Number 4 you found that
> it was, were you still able to restate the original sub-licensing agreement?
> **A:** As far as we were concerned Amendment Number 4 had absolutely
> no effect on the continuation of the sub-license.  It didn't terminate it by

> its terms.  It didn't terminate payments due under it.  It eliminated in
> again some undefined manner 2.7 million dollars in payments that may
> or may not have been due at one time or another.

(Doc. 207 at 76:1-18, 77:14-78:7).  CIT also cites the testimony of Randolph

Perkins, one of its attorneys, who was asked the following:

> **Q:** . . . if you have an agreement that governed the use of technology, and
> that agreement calls for the payment of no fees, can you restate that
> agreement to add for, add the payment of fees?
> **A:** Yes, absolutely.  You can add, subtract, change, revise terms, do
> anything you want to it, because it's a valid agreement.

(Doc. 219 at 25 (citing Doc. 206 at 226:16-23)).  CIT further emphasizes that

restating exists contracts to adapt to unanticipated circumstances is a common

practice in municipal projects.  (*Id*. at 26 (citing Doc. 206 at 254:14-255:1)).  They

also point to Calhoun's testimony that "agreements are restated as often as required

. . . It's very common for them to be amended and restated multiple times."  (*Id*.

(citing Doc. 207 at 31:3-4. 12-14)).

       At the outset, we agree with CIT that Pennsylvania's UWOA renders

THA's contention that the RSA fails for lack of consideration, to be

meritless.  *See* 33 PA. CONS. STAT. ANN. § 6 ("A written release or promise,

hereafter made and signed by the person releasing or promising, shall not be

invalid or unenforceable for lack of consideration, if the writing also

contains an additional express statement, in any form of language, that the

signer intends to be legally bound."). In *Yocca v. Pittsburgh Steelers Sports,*

*Incorporated*, the Pennsylvania Supreme Court ultimately found that the trial

court's dismissal of the plaintiff's claim for declaratory relief was proper

when it concluded that:

> the [a]greement could not be declared void for want of consideration
> because the parties explicitly agreed in the [agreement] to be legally
> bound by that Agreement and the Pennsylvania Uniform Written
> Obligations Act, makes clear that a written agreement shall not be void
> for lack of consideration if it contains an express statement that the signer
> intends to be legally bound by it.

854 A.2d 425, 433 (Pa. 2004) (internal citations and mark omitted).  Also, unlike

the Pennsylvania Superior Court's finding in *First Federal Savings & Loan*

*Association v. Reggie*, where a bank sought to raise the enforceability of a

mortgage on appeal and the court found that "the bank has altogether failed to

specify the language in the mortgage which allegedly qualifies as a substitute for

consideration under the Uniform Written Obligations Act," CIT has in this case

highlighted the operative provision in the RSA.  Accordingly, we find that the

following clause in the RSA, which states "NOW, THEREFORE, in consideration

of the mutual premises set forth herein, *and for other good and valuable*

*consideration, the receipt and adequacy of which is hereby acknowledged*, the

Parties hereby agree to amend and restate the Replaced Agreement in its entirety as

follows . . .," satisfies the UWOA's provision allowing a statement reflecting the

43

parties' intent to be bound to constitute a substitute for consideration.  (*See* J.E. 38 at THA06614) (emphasis added); *see also Wound Care Cters., Inc. v. Catalane*, 2011 U.S. Dist. LEXIS 12084, at *53 (W.D. Pa. 2011) (holding that the statement "intending to be legally bound" in a noncompetition agreement constituted adequate consideration under Pennsylvania's UWOA); *Interdigital Commc'ns. Corp. v. Fed. Ins. Co.*, 392 F. Supp. 2d 707, (E.D. Pa. 2005) (stating that the requirements of the UWOA are satisfied by "an additional express statement, in any form of language, that the signer intends to be bound."); *Kay v. Kay*, 334 A.2d 585, 587 (Pa. 1975) (noting that a clause which stated that appellant intends to be legally bound by the agreement constituted adequate consideration under Pennsylvania's UWOA).  Here, the RSA specifically provided in the last clause prior to the parties' signatures, "IN WITNESS WHEREOF, and *intending to be legally bound*, Licensor/Seller and The Authority have caused this Agreement to be executed by their duly authorized officers . . . ."  (J.E. 38 at 11) (emphasis added). Therefore, pursuant to applicable Pennsylvania case law, we find that this provision within the RSA constitutes an adequate substitute for consideration under Pennsylvania's UWOA.

In addition, even if the clause just recited was insufficient to constitute a substitute for consideration, there was no evidence produced at trial that

Amendment Number 4 eliminated the payment of license fees.  We also agree with much of the testimony provided at trial that even if THA's obligation to pay license fees had been fully satisfied prior to execution of the RSA, there was nothing in the RSA, or any other documents that came to our attention, that would prevent THA from restating the original agreement and with that, the obligation to make continued license fee payments.  (*See* Doc. 207 at 131:20-132:3 (Mrochek testifying that even if THA had paid for all of the fees under the 2003 original sublicensing agreement, nothing prevented it from restablishing "a set of fees if there are any other obligations involved in the document.")).  Moreover, we find unremarkable that the original SLA was restated and amended, as many individuals testified at trial that such transactions are often restated numerous times to adapt to changing circumstances.  (*See* Doc. 207 at 31:3-4, 12-14 (Calhoun testifying that "agreements are restated as often as required . . . .  It's very common for them to be amended and restated multiple times.")).

Finally, again we find significant that THA accepted the benefits flowing from the financing provided by CIT, namely the eventual completion of the incinerator, knowing that CIT was relying on its representations regarding the legal effect and binding nature of the agreement.

### F.   Debt v. Operating Expenses

THA also argues that payment of $25 million is not an operating expense related to the use of the technology. (Doc. 217 at 53). For example, it claims that because the licensing fees were required regardless of whether the technology worked or was used, there is little difference between the licensing fees and repayment of a loan. Moreover, THA asserts that the actual structure of the transaction required THA to repay the "bailout" given to Barlow, which had little to do with use of the technology. (*Id*. at 54). It maintains that CIT's repeated characterization of the licensing fee as an operating expense is insufficient to render it a true operating expense. Accordingly, THA suggests, the true nature of the transaction between Barlow, THA, and CIT was a financing, and as such CIT should assume a subordinate position in the context of THA's debt obligations. (*Id*. at 55-56).

In support of this assertion, Dauphin focuses upon the Second Circuit's holding in *In re PCH Associates* where the court held "that [a] label [attached to a document] neither governs the rights of third parties nor affects the legal consequences of the parties' agreement." (Doc. 218 at 44-45 (citing 804 F.2d 193, 198 (2d Cir. 1986))). It also cites to the Pennsylvania Supreme Court's decision in *Capozzoli v. Stone & Webster Engineering Corporation* where the court held that:

> Courts will not be controlled by the nomenclature the parties apply to their relationship: . . . Neither the form of a contract nor the name given

it by the parties controls its interpretation.   In determining the real character of a contract courts will always look to its purpose, rather than to the name given it by the parties. . . .   The proper construction of a contract is not dependent upon any name given it by the parties, or upon any one provision, but, upon the entire body of the contract and its legal effect as a whole.

(*Id*. at 46-47 (citing 42 A.2d 524, 525 (Pa. 1945))).  Dauphin reiterates that the absolute payment requirement under the RSA militates against characterizing the payments as operating expenses, and instead proves that such payments are in reality debt repayment.  Furthermore, it claims that Amendment 9, whereby Barlow agreed to pay THA license fees that THA would then forward to CIT, also renders the license fees as repayment of a loan from THA to Barlow.  (*Id*. at 48).  As a result, Dauphin argues that it is proper for the Court to recharacterize the transaction as a construction loan.  (*Id*. at 49-50).  It also cites the testimony of numerous individuals who noted that while CIT sought to obtain the substantive equivalent of debtor-in-possession financing, the license fees were nevertheless called operating expenses by the parties to the RSA.  (*Id*. at 50 (citing Doc. 203 at 198:21-199:24 (citing testimony of Daniel Morash, the former senior managing director and global head of the energy and infrastructure group at CIT, that "we looked at this as a financing as opposed to an acquisition, meaning that the structure was an acquisition technically, but in substance it was the substantive equivalent of debtor in possession financ[ing]."))).  Dauphin also highlights

Morash's testimony, to the extent he indicated that the transaction was structured this way because "there's typically a, what's called a waterfall of payments, which is a priority of payments in bonded indentures, and operating expenses get paid first before debt service, and there was a very large amount of bond debt outstanding against this plant.  So that was one of our concerns."  (*Id*. at 52 (citing Doc. 203 at 184:6-15)).

Furthermore, Dauphin claims that the payments made pursuant to the RSA are not operating expenses because they are not required for the operation and maintenance of the facility.  (*Id*. at 54).  For example, it asserts that under Amendment 4/1, THA already had the right to use the combustion technology.  (*Id*. (citing J.E. 3)).  Dauphin notes that according to Gerard Yarnall, its expert witness, from an accounting perspective the payments would not have been considered operating expenses under the indenture.  (*Id*. at 55 (citing Doc. 204 at 172:25-173:10)).  Yarnall applied what is know in accounting as "representational faithfulness," or "substance over form," in concluding that:

> . . . when I looked at what was going on in this particular situation I didn't necessarily see anybody looking to expand the number of burners. I didn't look, I didn't see people looking to purchase the technology, so I wasn't convinced that really the economic essence of this transaction was reflected in the items that were received by the Authority when they entered into this agreement.  Rather, I saw people looking for a way to find financing to complete the retrofit project.

(*Id*. at 56 (citing Doc. 204 at 175:5-16)).

Finally, Dauphin maintains that repayments of a guaranty on a construction loan are not operating expenses which are entitled to priority of repayment. (*Id*. at 57).  It asserts that under the MAA, "financing" is defined as "providing of funds to or on behalf of a person for payment of the costs of a project or for refinancing such costs, [or] repayment of loans previously incurred to pay the cost of a project or otherwise." (*Id*. at 58 (citing 53 PA. CONS. STAT. § 5602)).  Therefore, Dauphin claims that the license fees cannot be operating expenses because the repayment of a financing cannot, under the Trust Indentures, also be "operating expenses."  It contends that CIT overlooks the language in the 1998 Indenture providing that operating expenses are those expenses "required in operating and maintaining the [Facility]." (*Id*. at 59 (citing P.E. 39 at 26)).

In response, CIT contends that because its money was the last going into the project, it insisted that its money be the first to come out.  Furthermore, because it refused to bear any construction or operation risks, it also required the "hell or high water" clause so that payment of the licensing fees was not contingent upon either of these risks.  (*Id*. at 28).  CIT highlights the testimony of numerous witnesses who testified that the license fees for the technology were operating expenses. (Doc. 219 at 29 n.28 (citing Doc. 206 at 71:25-72:2 (Smida stating, "I understood

that a licensing fee for technology is an expense for the facility.  They needed it, yes.")); (Doc. 202 at 184:13-14 (Giorgione testifying, "I think a licensing fee is an operating expense.  I think that's a general proposition in these financings, yes.")); (Doc. 203 at 179:4-7 (Morash noting, ". . . the sub-licensing agreement was an operating expense of THA, which in the waterfall of payments comes ahead of debt service.")); (Doc. 206 at 152:19-22 (Perkins stating, "[o]perating lease payments, license payments would be considered operating expenses under any documents that I have seen."))).

Additionally, CIT emphasizes that without a characterization of the license fees as operating expenses, it would never have entered into the transaction.  (Doc. 219 at 29 (citing Doc. 202 at 191:5-13 (reflecting Giogione's understanding that operating expenses was "paramount" to CIT's underwriting of the transaction), Doc. 203 at 185:7-10 (noting Morash's testimony that without the representations and warranties, CIT would not have closed the transaction))).  Also, it argues that despite Giorgione's testimony that he communicated his concerns regarding the operating expense characterization to CIT, (*see* doc. 202 at 36:14-37:5), CIT's witnesses indicated that no one with THA ever informed CIT that it thought the license fees were not operating expenses.  (Doc. 219 at 31-32 (citing Doc. 207 at

93:16-94:17)).[8]  CIT also cites the RSA itself which states "the Combustion

Technology licensed and purchased hereunder is necessary for the operation for the

Facility, payments made with respect to such license and purchase shall constitute

'Operating Expenses' as such term is used in the Existing Authority Indenture

Documents, and such fees shall be paid prior to any Debt Service Expenses."  (*Id.*

at 32 (citing J.E. 38 ¶ 6(d)(i))).  It also highlighted an email from Foreman to

Giorgione, where in discussing the characterization of the license fees he stated

"[c]ould we say: the technology licensed and purchased hereunder is necessary for

---

[8]  Specifically, Mrochek testified as follows:

**Q:** Did the Harrisburg Authority and Mr. Andy Giorgione express an opinion as to whether or not these licensing fees would be operating expenses?
**A:** They confirmed that they believed they were operating expenses.
**Q:** Did Mr. Giorgione or anyone else from the Harrisburg Authority ever raise questions to you as to whether or not the payments under the license, the restated sub-licensing agreement were operating expenses?
**A:** Nobody ever asked or nobody gave indication that they thought they were not operating expenses.  There were some indications that they'd rather not have to highlight it or discuss it unnecessarily with folks, but they never exhibited any discomfort about calling it an operating expense in making those representations to us.
**Q:** Were there any, did Mr. Giorgione or anyone else from the Harrisburg Authority express any other concerns to you about this transaction by the time that right before it closed?
**A:** Concerns about the enforceability or effectiveness of the transaction, no. Generally the only concern was that we get it done efficiently and quickly.
**Q:** Do you know if CIT relied upon the representations in the restated sub-license agreement in agreeing to provide the 25 million dollars for the retrofit project.
**A:** I know that they could not have gotten the project approved or the deal approved without those representations and warranties.

(Doc. 207 at 93:16-94:24).

the operation of the Facility and the payment of necessary costs for the operation of

the Facility are 'operating expenses' as such tern is used in the Existing Authority

Indenture . . . ."  (*Id*. at 33 n.34 (citing D.E. 13)).

Finally, CIT emphasizes that all of these factors combined, including the

definition of "operating expenses" in the RSA, that THA treated the license fees as

operating expenses when it paid them in 2006, and that THA consented to

characterization of the fees as operating expenses numerous times through various

officials, demonstrates that the license fees were in fact operating expenses.  (*Id*. at

34).  It also emphasizes that the definition of "operating expenses" in the 2003

Indenture states;

> 'Operating Expenses' shall mean Administrative Expenses, Authority
> Utility Expenses and all expenses of the Waste Management Facility
> Manager (excluding depreciation) required in operating and maintaining
> the Waste Management Facility pursuant to the Management Agreement,
> including, in each case, without intending to limit the generality of the
> foregoing: A.  Expenses of operation, maintenance, repair, alteration,
> insurance and inspection, and any sums payable periodically to any
> Person or other entity pursuant to any agreement related to the Waste
> Management Facility. . . .

(*Id*. at 35 (citing P.E. 35 at 31)).

In response to Dauphin's contentions, CIT argues that Plaintiffs' reliance on

*PCH Associates* is misplaced because this case only required the court to look

beyond an agreement's stated terms in order to comply with a statutory policy.

(*Id*.).  Thus, because *PCH Associates* involved a mandate in the bankruptcy code

that a "court look beyond mere form to the circumstances of each case, including

the economic substance of the transaction, to determine whether a 'true lease'

exists for purposes of the Code," CIT claims that it is distinct from the instant case

because here, the RSA is not ambiguous and does not require recharacterization by

the Court.  (*Id*. at 37-38).

CIT further claims that THA's contention that Amendment 9 is evidence of a

direct payment obligation from Barlow to CIT, wherein THA would only pay if

Barlow could not pay, constitutes a contortion of the documents and testimony

elicited at trial.  (*Id* at 39).  Notably, CIT asserts, it is undisputed that it did not

know about Amendment 9 and it was not a party to the agreement.  (*Id*. at 39

(citing *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) ("It goes without

saying that a contract cannot bind a nonparty"))).  Thus, CIT maintains that

viewing Amendment 9 as a direct loan from CIT to Barlow requires a strained

interpretation of the same.  (*Id*. at 40).  They also claim that the plain language of

Amendment 9 only requires Barlow to forward base fees to THA that are owed to

CIT pursuant to the RSA for three particular time periods: (1) "for each calendar

quarter for 2006," (2) after 2006 but only if the incinerator had not reached a

"Steady State of Operations (as defined in Amendment Number 5 to the Equipment

53

Agreement); and (3) after the Reduction Date (defined as when the $25 million had been paid).  (*Id*. at 40 (citing J.E. 40)).  As a result, CIT argues that if the incinerator was operational by 2007, which the parties anticipated it would be, Barlow would not be obligated to forward any money to THA.  Moreover, CIT contends that the parties understood, based on emails exchanged between Lispi, Foreman, Mealy, and Giorgione, that "under the side agreement Barlow assumes the responsibility to pay for the first year of payments required under the interim loan." (*Id*. at 41 (citing J.E. 22 at 2)).  In fact, Giorgione expressly represented to Smida that "[a]s of 2006, Barlow is paying the fees on behalf of the Authority." (*Id*.(citing D.E. 19)).  Such statements, CIT argues, were made in close proximity to execution of the RSA and Amendment 9, and consequently they reflect the true intent and understanding of the parties.

Furthermore, although Giorgione testified that the parties intended for Barlow to be responsible for all the payments, CIT highlights that Amendment 9 stands in conflict with this contention because unlike the RSA, which required THA to make payments to CIT of Base Fees and Supplemental Fees, Amendment 9 only addressed payment of Base Fees.  (*Id*. at 41); (*See* J.E. 40 ¶ 5(ii)).  Thus, for Giorgione's interpretation of the transaction to be correct, Amendment 9 would have had to address all fees, including the supplemental fees.  (*Id*. at 41-42).

Finally, CIT maintains that the testimony adduced at trial demonstrates that there was never a loan from CIT to Barlow that was created by virtue of Amendment 9. (*Id*. at 42 (citing Doc. 203 at 143:5-7 (Giorgione testified as follows:  "**Q:** At the end of the day, Mr. Giorgione, there was no loan by CIT to Barlow, correct?  **A:** Correct."); 177:10-11 (Morash stating:  "**A:** There was no way [CIT was] going to loan money to Barlow"); Doc. 205 at 89:11-14 (Foreman noting:  "the following week it seemed in my mind that the deal had changed completely and it no longer felt to me like a loan to Barlow.")).

Again, despite THA and Dauphin's request that the Court intervene to save them from an agreement they willingly and intentionally entered into, we find their arguments regarding characterization of the license fees to be utterly inconsistent with the record produced at trial which is replete with affirmative representations from both City and County officials acknowledging the licensing fees as operating expenses necessary for the continued operation of the incinerator.  For example, Smida testified "I understood that a licensing fee for technology is an expense for the facility.  They needed it, yes.  **Q:** 'And as such an operating expense,' just to finish that sentence, basically what you just said.  **A:**  That's correct."  (Doc. 206 at 71:25-72:6).  Moreover, Giorgione testified that "I think a licensing fee is an operating expense.  I think that's a general proposition in these financings, yes."

(Doc. 202 at 184:13-14).

In addition, paragraph 6(d)(i) of the RSA states "the Combustion Technology licensed and purchased hereunder is necessary for the operation for the Facility, payments made with respect to such license and purchase shall constitute 'Operating Expenses' as such term is used in the Existing Authority Indenture Documents, and such fees shall be paid prior to any Debt Services Expenses." (J.E. 38 ¶ 6(d)(i)). Under the 2003 Trust Indenture, "operating expenses" are defined as follows:

> Operating Expenses shall mean Administrative Expenses, Authority Utility Expenses and all expenses of the Waste Management Facility Manger (excluding depreciation) required in operating and maintaining the Waste Management Facility pursuant to the Management Agreement, including, in each case, without intending to limit the generality of the foregoing:
>
> A.   Expenses of operation, maintenance, repair, alteration, insurance and inspection, and any sums payable periodically to any Person or other entity pursuant to any agreement related to the Waste Management Facility.
>
> B.   Expenses of managerial, supervisory, labor, employee training, administrative, engineering, financial, architectural, legal, public relations and auditing services;
>
> C.   Sums payable to any Person or other entity which sums, under sound accounting and/or engineering practice, as the case may be, constitute expenses of operation and maintenance;
>
> D.   All taxes, assessments and charges, or contributions or payments in lieu thereof, including, without intending to limit the generality of the foregoing, income, profits, property, franchise and excise taxes;
>
> E.   All expenses of complying with applicable laws and applicable

permits, including the costs and expenses of preparing and
submitting reports and posting bonds required thereunder or in
connection therewith; and

F.    Required funding of the Operating Reserve Account pursuant to
Section 6.01(b) of the 1998 Indenture or hereunder.

(P.E. 35 at 31-32). Thus, the definition of operating expenses contained in the

2003 Trust Indenture demonstrates that the license fees paid under the RSA, as

contemplated by the many officials who touched this transaction, clearly qualify as

operating expenses required for the "operation, maintenance, . . ., and any sums

payable periodically to any Person or other entity pursuant to any agreement related

to the Waste Management Facility." (*Id.*). In fact, numerous individuals testified

that the license fee was a necessary operating expense for the incinerator, and that

THA had restated the original SLA and obligated itself to future license fee

payments, as well as its continued obligations under the SLA, through the RSA.

For example, Calhoun testified as follows regarding the interplay between the

definition of "operating expenses" contained in the RSA and the 1998 Trust

Indenture:

**Q:** . . .  It says, "All expenses," . . . "required in operating and
maintaining the waste management facility." It does say that, correct?
**A:** Yes.
**Q:** But then further on it says, "Without intending to limit the generality
of the foregoing," and then it lists additional items, correct?
**A:** Yes.
**Q:** A through F?

**A:** Yes.

**Q:** And A says, and that's the language that you cited, or quoted, in your opinion correct?

**A:** Yes.  It's similar to the language in the 1998 series indenture.

**Q:** And the first portion of Section A says, "Expenses of operation, maintenance, repair, alteration, insurance, and inspection."  Correct?

**A:** Yes.

**Q:** Then it goes on to say, "And any sums payable periodically to any person or other entity pursuant to any agreement related to the waste management facility."  Correct?

**A:** Yes.

**Q:** and . . . the license fees pursuant to the restated sub-license agreement in this case in your view come within that definition?

**A:** Yes, they do.

      *        *        *        *        *

**Q:** So Mr. Foreman's opinion says that the restated sub-licensing agreement is enforceable according to its terms, right?

**A:** Yes, it does.

**Q:** So now we simply go back to the restated sub-licensing agreement and take a look at its terms to determine exactly what it is that Mr. Foreman has declared enforceable, right?

**A:** Correct.

      *        *        *        *        *

**Q:** It says under [ ] [section 6(d) of the RSA] that, "The combustion technology licensed and purchased hereunder is necessary for the operation of the facility.  Payments made with respect to such license and purchase shall constitute operating expenses as such term is used in the existing Authority indenture document," correct?

**A:** Yes.

**Q:** Is this one of the terms that you understood Mr. Foreman to be referring to in his opinion?

**A:** Yes.

**Q:** So is it fair to say despite the fact Mr. Foreman's opinion doesn't have the word "operating expense" in it, it nonetheless makes specific reference to this provision in the [RSA] which does?

**A;** Yes, it does.

(Doc. 207 at 60:8-61:17; 62:22-63:5; 63:19-64:11).

Furthermore, we find significant a statement contained in a January 10, 2006 email from Giorgione to Smida, regarding characterization of the licensing fees as operating expenses, to be particularly instructive at this point.  The email, though lengthy, bears repeating in full as the Court finds it illustrative of the complex machinations devised by THA's representatives in securing the funding for which it was so desperate.  The email reads:

> I am not sure how, technically, a licensing fee is not an operating expense.  The original contract in 2003 had a licensing fee attached to it, which was to be paid as an operating expense . . . it just so happens now that the fee is more.  We need [the] right to use and eventually own the technology in order to run the Facility.  That is no different from active carbon, water, electricity etc. or any other material that makes the plant run.  As such, how could you say that it is not an expense to operate?  If you look at industry standards, technology licensing could run in the millions every year, so it is even arguable that it is reasonable, which is really the only true issue and not, as you suggest, whether it is an expense.
>
> As for 2006, Barlow is paying the fee on behalf of the Authority.  We negotiated into the deal yesterday a provision that we can hold retained funds to secure that payment.  As such, this will not be an issue in 2006.  It will only be an issue if the sale does not occur, but our plan, as previously explained, is to refi. this amount and throw the Sub-License in the trash.  Then, through the refi., this debt will be subordinated to the existing debt (and not an operating expense) including what the County has guaranteed.  Thus, the County is in no worse position than it is today.
>
> The Authority and City are being asking to represent that the Licensing fee is an operating expense.  We are all comfortable doing that, however, with your email, you are calling into question our ability to proceed.  I

59

think you need to reconsider you[r] points and we need to discuss this asap.

(D.E. 19 at 1).  Regarding this exhibit, Giorgione testified as follows:

> **Q:** . . .  So when you're writing to Mr. Smida with regards to the thing in the e-mail, you also write, "As for 2006 Barlow is paying the fee on behalf of the Authority."  Below the paying the fee on behalf of the Authority, we negotiated into the deal yesterday a provision that we can hold, retain funds to secure that payment.  As such, this will not be an issue in 2006.  It will only be an issue if the sale does not occur, but our plan as previously explained is to refi this amount and throw the sub-license in the trash.  Then through the refi this debt will be subordinate to the existing debt and not an operating expense, including what the county has guaranteed.  Thus, the county is in no worse position than it is today."  Now, with regard [ ] to [what] you testified about earlier that the whole plan here was to not let this sit on the books as an operating expense very long?

> **A:** Yes.  I mean, as you recall my testimony from yesterday at this time, and I mean in, you know, late fall 2005, when Barlow was out of cash again, we consulted with the investment bankers about going out in the market ourselves and issuing debt to complete the plant, and they basically said that they didn't believe there were going to be any buyers of bonds for that, that really the marketplace wouldn't free up until the plant was complete, up, and running.  So as I was indicating to Tom here, that was one of our plans, that at the end of the day once the plant was complete using these funds and operating, you know, either we were going to sell it or we were going to refi it, and we'll take it out and this'll be, you know, this will be in line with the other, actually it'll probably wind up being subordinate to the other debt obligations.

(Doc. 203 at 133:21-135:10).  Despite the best intentions of THA to sell the

incinerator or refinance their obligation with respect to the license fees into a larger

financing that involved the sale of the incinerator, which would have subordinated

60

the claim for license fees to other pre-existing debt, such events never transpired

and, in the Court's view, the license fees remained operating expenses subject to

CIT's bargained for exchange which required that its money be the "first out." In

addition, Morash noted:

> **A:** . . . operating contracts are often used in project finance as a way to
> secure the raising of capital.
> **Q:** And you see this restated sub-licensing agreement as an operating
> agreement – excuse me, an operating expense type of a contract?
> **A:** That was the whole point. That was how we got to [the] substantive
> equivalent of a debtor in possession financing.

(Doc. 203 at 183:22-184:5).

Given all of the foregoing, the Court is hard-pressed to find that the license

fees paid pursuant to the RSA are not operating expenses.

### G. The Forbearance Agreement and Estoppel

CIT also asserts that THA released any claims against CIT when it executed

the Forbearance Agreement. (Doc. 219 at 43). Specifically, paragraph 7 provides:

> As additional consideration for CIT to enter into this Forbearance
> Agreement, the Authority hereby fully and unconditionally releases and
> forever discharges CIT and its affiliates . . . (the "Released Parties") of
> and from any and all claims, liabilities, demands, obligations, damages,
> losses, actions and causes of action whatsoever which the Authority may
> now have or claim to have against CIT or any other Released Parties as
> of the date hereof, whether presently known or unknown and of any
> nature and extent whatsoever, including, without limitation, on account
> of or in any way affecting, concerning or arising out of or founded upon
> this Forbearance Agreement or the Existing Sub-License, including but
> not limited to, the administration of enforcement of the obligations to pay

Base Fees or Supplemental Fees under the Existing Sub-License.

(*Id.* (citing J.E. 47 ¶ 7)).  Furthermore, CIT claims that Dauphin is without remedy in seeking to invalidate this agreement.  It highlights the testimony of Smida who stated the following:

> **Q:** what was required in your view from the county to close this deal other than your e-mail communications with Mr. Giorgione?
> **A:** What was required was nothing.  We were told that we were getting a look under the tent flap to see the transaction.  We weren't asked to consent.  We weren't asked to approve. . . .
> **Q:** . . . was there a consent from the county that was required to close this deal?
> **A:** No, sir, there was not, to my knowledge.

(*Id.* at 44 (citing Doc. 206 at 76:14-77:3)).  Despite this, CIT contends that THA nevertheless provided Dauphin with all of the pertinent information it would need to object to the transaction.  For example, Giorgione met with Smida on January 6, 2006 to personally discuss the transaction, and thereafter provided him with copies of Amendment 9 and the RSA by the following Monday.  (*Id.* at 44 (citing D.E. 17)).  As further support for its position, CIT highlights a letter from Giorgione to Mayor Reed on January 11, 2006 which stated, "the City acknowledges the payment priority of CIT under the Sub-License as an operating expense.  We have confirmed that this is acceptable under the existing Indentures, other bond documents *and with the County*."  (*Id.* at 45 (citing J.E. 30 at 1) (emphasis added)).  Finally, CIT highlights Dauphin's understanding that the infusion of CIT's money

into the project was necessary to ensure completion of the project, and to avoid the necessity of the County making payments to bondholders on THA's outstanding debt. (*Id*. at 47).

Again, we find noteworthy the fact that Smida, on behalf of Dauphin, questioned THA's characterization of the license fees as operating expenses. As a result, we find Dauphin's attempts herein to minimize the authority it actually possessed to object to the RSA, to be disingenuous. Furthermore, we find Dauphin's assertion that it was merely called to "look under the tent flap to see the transaction" to constitute a gross understatement of the authority it truly retained in reviewing, commenting, and objecting to the RSA. Moreover, we recognize this argument on behalf of the County to illustrate yet another example of the many ways nearly each and every official involved in this transaction has feverishly sought to distance themselves therefrom in light of its now controversial and radioactive nature.

In addition, we find the following testimony from Foreman to be particularly instructive on this issue. He stated:

> **Q:** There's certainly nothing wrong with the Harrisburg Authority ratifying a prior agreement, is there?
> **A:** There's nothing generally wrong with ratifying an agreement.
> **Q:** And, sir, with regard to the advisability of waiting seventeen months before ratification, doesn't that really depend on the circumstances and the reason why a ratification is requested at any one point in time?

**A:** Correct.

**Q:** Such that there was no reason for a forbearance agreement until such time as the Harrisburg Authority couldn't make the payments that it was obligated to make under the restated sub-licensing agreement?

**A:** That would be a reason for the time for a forbearance agreement.

(Doc. 205 at 193:21-194:13). Therefore, the testimony elicited at trial, combined with the plain language of the Forbearance Agreement, make clear that CIT was released and discharged from "any and all claims, liabilities, demands, obligations, damages, losses, actions and causes of action whatsoever which the Authority may now have or claim to have against CIT." (J.E. 47 ¶ 7). As additional grounds for our findings herein, we conclude that THA knowingly and voluntarily waived its rights to lodge claims against CIT pertaining to the Forbearance Agreement, the RSA, and any Base Fees or Supplemental Fees under the RSA. Furthermore, we find that the Forbearance Agreement specifically ratified the RSA. (*Id.* ¶ 9). Consequently, an alternative ground for our findings herein is that THA is estopped from seeking relief from CIT because it not only ratified the RSA through the Forbearance Agreement, but it expressly agreed to waive any claims emanating from the underlying RSA.

## V.    CONCLUSION

For the reasons more fully set forth above, it is the ruling of this Court that judgement shall be entered in favor of CIT/Aireal and against THA and Dauphin

County on Plaintiffs' claim.  Judgment is also entered in favor of CIT and against

THA in the amount of $19,300,027.40, plus interest, since January 4, 2012, in

addition to post-judgment interest and shall be paid in full by THA prior to any

further payments by THA to its bondholders.

In closing, we recognize that this litigation is but one more sad chapter in the

ongoing saga of Harrisburg's disastrous debt crisis.  The facts revealed at trial

appear illustrative of so many of the incidents that precipitated the precarious

situation the City finds itself in today.  Notably, numerous experienced

professionals touched all aspects of the transaction we have been asked to reverse,

and before its formation several expressed their concerns about its structure quietly

and in some cases privately.  Yet, until the deal failed, not one had the courage to

strongly and publicly flash the red light that might have altered the perilous course

that had been charted.

While THA would have this Court believe that the quagmire of transactional

documents it found itself a party to as a result of the protracted incinerator upgrade,

coupled with the sudden nature of the RSA's execution, were solely the product of

ultra vires decision-making by members of the THA Board and a few select

officials for the City of Harrisburg, the Court expressly finds otherwise.  The

cascading series of failures surrounding this project were not the result of a few

rogue government officials, but were very clearly the fruit of carefully considered but calculated risks gone terribly awry.  That consideration was undertaken by some of the most intelligent and sophisticated professionals in the Harrisburg region, who despite their apprehension signed off on the transaction as what was in their view the best, or indeed the only way to complete the upgrade of the incinerator.

Plaintiffs' *post hoc* remorse for the arms-length transactions they entered into is the true animation for this litigation.  But remorse alone cannot supplant legal reasoning, and what is improvident is not necessarily illegal.  There was no fraud in this deal, nor can we find deceit in any measure.  Rather, we are asked to disrupt a fully vetted agreement that Plaintiffs now regret having entered.  We decline the invitation to, in effect, save Plaintiffs from what may have been their own poor judgment.

An appropriate Order shall follow.